AZRA Z. MEHDI (220406)
THE MEHDI FIRM
One Market
Spear Tower, Suite 3600
San Francisco, CA 94105
Telephone: (415) 293-8039
Facsimile: (415) 293-8001
Email: azram@themehdifirm.com

ROY A. KATRIEL (265463)
THE KATRIEL LAW FIRM
12707 High Bluff Drive, Suite 200
San Diego, CA 92130
Telephone: (858) 350-4342
Facsimile:  (858) 430-3719
Email: rak@katriellaw.com

*Attorneys for Plaintiffs*
*[additional counsel listed on signature block page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES STEWART, JOEL MILNE, AND JOSEPH STRAZZULLO, On Behalf of Themselves and All Others Similarly Situated, | Case No.: 3:12-cv-5164-EMC |
| Plaintiffs | FIRST AMENDED CLASS ACTION COMPLAINT FOR: |
| vs. | (1) Violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. Section 1; |
| GOGO INC., | (2) .Violations of Section 2 of the Sherman Antitrust Act, 15 U.S.C. Section 2; |
| Defendant. | (3) Violations of the California Cartwright Act, California Bus. & Prof. Code Section 16720, *et seq.*; and |
| | (4) Violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code Section 17200, *et seq*. |
| | DEMAND FOR JURY TRIAL |

## NATURE OF THE ACTION

1.      Plaintiffs James Stewart, Joel Milne, and Joseph Strazzullo (collectively "Plaintiffs"), by and through their undersigned counsel, hereby bring this action on behalf of themselves and all other similarly situated persons in the United States who, during the Class Period defined herein, have purchased inflight internet access services on domestic commercial airline flights within the United States from Defendant Gogo Inc. ("Gogo"). Plaintiffs seek monetary, equitable, declaratory, and injunctive relief, as well as attorneys' fees and costs, as redress for Gogo's violations of federal antitrust laws and pertinent California statutes. As detailed herein, Gogo has unlawfully obtained and/or maintained monopoly market power in the United States market for inflight internet connectivity on domestic commercial aircraft by resort to anti-competitive conduct that includes a series of long-term exclusive contracts with the major domestic airlines in the United States. These exclusive contracts have the purpose and effect of thwarting competition on the merits and on price, and have permitted Gogo to charge consumers like Plaintiffs and the members of the class they seek to represent supra-competitive prices.

## JURISDICTION AND VENUE

2.      Count I of this Class Action Complaint states a claim for unlawful agreements in restraint of trade in violation of Section 1 of the Sherman Antitrust Act (the "Sherman Act"), 15 U.S.C. Section 1. This Court, therefore, has subject-matter jurisdiction over this count pursuant to 28 U.S.C. Sections 1331 and 1337.

3.      Counts II and III of this Class Action Complaint state claims for unlawful acquisition and maintenance of monopoly market power, respectively, in violation of Section 2 of the Sherman Act, 15 U.S.C. §2. This Court, therefore, has subject-matter jurisdiction over these counts pursuant to 28 U.S.C. Sections 1331 and 1337.

4.      Count IV of this Class Action Complaint states a claim on behalf of a subclass of California purchasers of Gogo inflight internet service for Gogo's violations of the California Cartwright Act, Cal. Bus. & Prof. Code §16720, *et seq*. This Court has supplemental subject-matter jurisdiction over these claims pursuant to 28 U.S.C. Section 1367 because the claims arise

FIRST AMENDED CLASS ACTION
COMPLAINT

from the same nucleus of operative facts as the remaining claims in this Class Action Complaint over which this Court has original federal question subject-matter jurisdiction.

5.   Count V of this Class Action Complaint states a claim on behalf of a subclass of California purchasers of Gogo inflight internet service for Gogo's violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code, §17200, *et seq*. (the "UCL").  This Court has supplemental subject-matter jurisdiction over these claims pursuant to 28 U.S.C. Section1367 because the claims arise from the same nucleus of operative facts as the remaining claims in this Class Action Complaint over which this Court has original federal question subject-matter jurisdiction.

6.   This Court also independently has subject-matter jurisdiction over all the counts of this Class Action Complaint pursuant to the Class Action Fairness Act, 28 U.S.C. §1332(d), because this is a class action where the citizenship of the class is diverse from the citizenship of defendant, and where the amount in controversy sought exceeds $5 million.

7.   This Court has personal jurisdiction over defendant Gogo because Gogo conducts business within this judicial district, including selling the very services that are at issue in this action to consumers residing within this judicial district. Plaintiff James Stewart is a resident of this judicial district.  Venue, therefore, is proper in this judicial district pursuant to 28 U.S.C. Section 1391.

## **PARTIES**

8.   Plaintiff James Stewart is a resident of San Francisco County in the State of California.  During the Class Period, Stewart flew on commercial flights within the United States on Virgin America, US Airways and Frontier Airlines, and purchased Gogo inflight internet access services for those flights.  Due to Gogo's unlawful actions in violation of the federal antitrust and California statutes, Stewart was subject to a supra-competitive overcharge for his inflight internet access purchases from Gogo.   By way of example, just during the past 6 months, Plaintiff James Stewart has made purchases of inflight internet access service from Gogo on flights operated by US Airways, Virgin America, Air Tran, American Airlines, and has was charged anywhere between $12.95 to $21.95 for these inflight internet access services by

FIRST AMENDED CLASS ACTION
COMPLAINT

Gogo—all at a time when rival inflight internet access service provided by competitor Row 44 on Southwest Airlines, for example, was being offered for $5.00.  Due to defendant Gogo's exclusionary and anticompetitive conduct detailed herein, however, Row 44's and other less expensive potential offerings were excluded from the broader market and, hence, were unable to provide price-constraining competition to Gogo's offerings, which have continued to increase in price.

9.     Plaintiff Joel Milne is a resident of California.  During the Class Period, Milne flew on commercial flights within the United States on American Airlines, Virgin America, and US Airways, and repeatedly purchased from Gogo an inflight internet access session that allowed him to access the internet during his flights.  Due to Gogo's unlawful actions in violation of the federal antitrust and California statutes, Mr. Milne was subject to a supra-competitive overcharge for his inflight internet access purchases from Gogo.  By way of example, in late 2011, Plaintiff Joel Milne purchased inflight internet access service from Gogo on a flight operated by American Airlines, and has was charged $14.95 for this inflight internet access service by Gogo—all at a time when rival inflight internet service access provided by competitor Row 44 on Southwest Airlines, for example, was being offered for $5.00.  Due to defendant Gogo's exclusionary and anticompetitive conduct detailed herein, however, Row 44's and other less expensive potential offerings were excluded from the broader market and, hence, were unable to provide price-constraining competition to Gogo's offerings, which have continued to increase in price.

10.     Plaintiff Joseph Strazzullo is a resident of California.  During the Class Period, Strazzullo flew on commercial flights within the United States on American Airlines, Virgin America, and Delta Airlines, and purchased Gogo inflight internet access services for those flights.  Due to Gogo's unlawful actions in violation of the federal antitrust and California statutes, Mr. Strazzullo was subject to a supra-competitive overcharge for his inflight internet access purchases from Gogo.  By way of example, since 2010 until mid-2012, Plaintiff Joseph Strazzullo made purchases of inflight internet access service from Gogo on flights operated by Delta, Virgin America, and American Airlines, and has was charged as high as $10.77 for these

3

FIRST AMENDED CLASS ACTION
COMPLAINT

inflight internet access services by Gogo—all at a time when rival inflight internet service access provided by competitor Row 44 on Southwest Airlines, for example, was being offered for $5.00. Due to defendant Gogo's exclusionary and anticompetitive conduct detailed herein, however, Row 44's and other less expensive potential offerings were excluded from the broader market and, hence, were unable to provide price-constraining competition to Gogo's offerings, which have continued to increase in price.

11.    Defendant Gogo is a corporation organized under the laws of the State of Delaware, and having its principal place of business at 1250 North Arlington Heights Road, Suite 500, Itasca, Illinois 60143. Gogo, formerly known as Aircell, touts itself on its website as "the world's leading provider of inflight connectivity." Since August 2008, Gogo has been providing broadband internet access to passengers on commercial aircraft. Currently, Gogo internet is the exclusive internet access connectivity provider along domestic commercial airlines routes flown by AirTran, Alaska Airlines, American Airlines, Delta, Frontier Airlines, United Airlines, US Airways, and Virgin America. Gogo currently provides internet access connectivity to nine out of the ten domestic U.S. airlines. Gogo-equipped planes represent approximately 85% of the North American aircraft that provide internet connectivity to its passengers. Approximately 95% of Gogo-equipped planes, moreover, are contracted under ten-year exclusive agreements.

### THE RELEVANT MARKET FOR DOMESTIC COMMERCIAL AIRCRAFT INFLIGHT INTERNET CONNECTIVITY

12.    For purposes of this Class Action Complaint, the relevant antitrust market is defined as the United States market for inflight internet access services on domestic commercial airline flights. The geographic antitrust market is nationwide.

13.    Many passengers on commercial aircraft within the United States demand or desire access to the internet while in flight. The demand from these passengers has created and supports a market for on-plane internet access connectivity. For these passengers, there are no readily available substitutes to which they can turn. Traditional internet service providers cannot provide internet service to plane passengers, both because traditional cellphone towers or underground wires relied upon by such providers are not capable of transmitting a signal to

4

FIRST AMENDED CLASS ACTION
COMPLAINT

commercial aircraft in flight, and also because current federal legislation or regulations prohibit the transmission of cellphone communication signals in flight.

14. Defendant is a provider of in-flight internet access. It does so by employing its Air-to-Ground ("ATG") network, which is comprised of nationwide cellular towers. Instead of being designed to transmit signals from land-based tower to land-based tower or to land-based cellular telephones or computers, however, the ATG towers are designed to beam their transmissions in a general vertical direction so that they can communicate with a commercial aircraft in the sky that is equipped with a corresponding ATG antenna and communications unit within the plane.

15. While Gogo is a provider, indeed the leading provider with approximately 90% market share, of on-plane internet access connectivity, it is not the only such provider. For example, a rival company, known as Row 44, also provides on-plane internet connectivity to commercial passengers within the United States. Unlike Gogo, which relies on its ATG network of land-based cellular towers to provide its service, Row 44 relies on a satellite-based in-flight broadband platform to provide commercial airline passengers with in-flight internet connectivity at broadband speeds.

16. Row 44's competing offering has several key technological advantages over the service offered by rival Gogo. Row 44's service is faster, offering broadband speeds of 11 Mbps TCP/IP, and 28 Mbps UDP to the plane. In addition, Row 44's satellite-based system allows airlines to offer uninterrupted broadband service across national boundaries, over oceans, and even in more remote regions of the world. By contrast, Gogo's service, being dependent on land-based cellular towers is limited in its coverage to the region where Gogo has land-based towers installed. Gogo has admitted that it will be unable to offer worldwide coverage until at least 2015.

17. Row 44's competing offering also has a significant price advantage over Gogo's current service. During the Class Period, Gogo charged on average $12.95 for passengers wishing to obtain internet access on domestic flights of at least three hours' duration. On some domestic airline carriers, it has recently increased this price to $17.95 for flights of three hours'

5

FIRST AMENDED CLASS ACTION
COMPLAINT

duration or more in which passengers purchase inflight internet access through their laptops, while charging $9.95 for this same flight duration on domestic airline carriers when the inflight internet access is purchase for use on the passenger's mobile device.  By contrast, Row 44, which is offered on domestic flights operated by Southwest Airlines, offers its service for a price of merely $5.00, regardless of the flight's duration.

18.    Besides Row 44, other providers exist that, but for Gogo's actions more fully described below, would offer competing service that would pose price-constraining competition to Gogo's offering.  For example, ViaSat is yet another provider offering a satellite-based system capable of providing inflight broadband internet access to commercial airline passengers.  Recently, JetBlue, a U.S. low-cost domestic airline carrier announced that it will be offering inflight internet broadband access to its passengers through its partnership with ViaSat, and expects to launch the system in its aircraft in late 2012, pending Federal Aviation Administration certification.  More recently, JetBlue announced a postponement of this launch, and now expects that the ViaSat offering of inflight broadband service will now occur in early 2013.

19.    Despite the existence of competing offerings and the potential for competing offerings from other providers, Gogo has managed to deny consumers the benefits of this actual and potential competition that would exist but for the actions that Gogo has taken and that are detailed below.

## GOGO'S MONOPOLY MARKET POWER AND ANTI-COMPETITIVE ACTIONS TO OBTAIN OR MAINTAIN IT

20.    Late last year, Gogo filed registration papers required by the Securities and Exchange Commission in connection with its planned Initial Public Offering ("IPO").  Those publicly filed papers document that Gogo claimed to possess an 85% share of the market for on-plane internet connectivity within the United States.  In fact, by now, and since the time that those papers were filed, it is likely that Gogo's market share has risen to approximately 90% because, upon information and belief, additional airplanes that were contracted to be outfitted with Gogo's equipment have been so equipped.  Further, given the disparity in pricing charged by Gogo for an internet session (i.e., $17.95 per session on flights of at least a three-hour duration) as compared to the lower price charged by Row 44 on Southwest Airlines-equipped

6

FIRST AMENDED CLASS ACTION
COMPLAINT

flights (i.e., $5.00 per session regardless of flight duration), it is likely that if market share were measured in terms of revenues, as opposed to units of sessions sold, Gogo's market share would significantly exceed 90%.

21.    Regardless, whether the market share figure of 85% referenced in Gogo's IPO papers or the still higher 90% plus figure is credited, Gogo has more than sufficient market power to exclude competition, reduce output, and increase price.  In fact, it has done so.

22.    The United States market for inflight internet connectivity on domestic commercial flights is characterized by high barriers to entry.  Among these high entry barriers are the high cost of infrastructure required to build a network capable of offering inflight internet connectivity.  Further, the market is characterized by restrictive legal and regulatory hurdles that serve to limit competitive entry.  For land-based systems, such as Gogo's ATG network, the Federal Communications Commission ("FCC") must provide and approve the required frequency spectrum for such transmissions to take place.  No further auctioning of ownership or use rights of frequency spectrums capable of transmitting broadband signals to aircraft are planned to be auctioned off by the FCC until at least the year 2016, thereby making Gogo the exclusive holder of an aircraft-capable frequency spectrum for the foreseeable future.  Resort to a satellite-based system is costly and requires partnering with a satellite launching company, as has been done by Row 44.  Moreover, Gogo's use of long-term (typically ten-year) exclusive contracts that legally prevent contracting airline carriers from employing any inflight internet connectivity provider, other than Gogo, during the ten-year duration of Gogo's contract, poses another high entry barrier.  In the face of this long-term exclusivity that Gogo has secured with respect to the 95% of the commercial aircraft it currently serves, few would-be entrants would find it financially feasible to incur the costs and clear the legal hurdles required for entry into the market when they know that, even upon doing so, the existence of these long-term, exclusive contracts, would prevent these new would-be entrants from being able to take business away from Gogo in the foreseeable future.

23.    With the exception of Southwest Airlines, Gogo has managed to secure contracts to provide internet access to all other major U.S. airlines that currently offer in-plane internet

7

access, including: AirTran, Alaska Airlines, American Airlines, Delta, Frontier Airlines, United Airlines, US Airways, and Virgin America.

24.   Rather than achieving or maintaining its monopoly market power through innovation or competition on the merits, however, Gogo has achieved or maintained its dominant market power by resorting to anti-competitive agreements with the airlines on whose planes Gogo's equipment is placed.  These agreements take the form of long-term exclusive agreements of ten years' duration during which the contracting airline agrees to contract only with Gogo for inflight internet connectivity services, to the exclusion of any and all competitors that currently exist or that may exist during the duration of these exclusive ten-year contracts.

25.   With Gogo's service first having launched in August 2008, the first of these Gogo exclusive contracts is not set to expire until the year 2018.  Until that time, planes equipped with Gogo's equipment cannot turn to a competing provider, even if that competitor were to offer (as Row 44 currently does) either more attractive technological features, better pricing, or both to the airline's passengers.

26.   Gogo has, in fact, exercised this monopoly market power, as is evidenced, for example, by its continuous and repeated raising of prices of its own internet inflight internet access service, which now are priced at as high as $17.95 plus taxes and fees (for a service that was initially priced at as low as $7.95 or $9.95 when it launched just a few years ago), even at a time when competing services with little market share are offered for as low as $5.00 per flight on, for example, Southwest Airlines.  Gogo's ability to and actual increase in prices at a time when competing offerings were available on other planes at significant lower prices indicates that, due to these competing offerings' low market share, they did not pose any meaningful price-constraining competition to Gogo's offerings.

27.   Gogo, itself has admitted in its IPO papers, that its long-term exclusive contracts are a key weapon that allows it to maintain what it calls its "strong incumbent position." Therein, Gogo touts to potential investors that:

> ***Strong Incumbent Position***. We are the world's leading provider of in-flight connectivity to the commercial aviation market and a leading provider of in-flight internet connectivity and other voice and data communications equipment

8

and services to the business aviation market.  In our CA [commercial aviation] business, we currently provide Gogo Connectivity to passengers on nine of the ten North American airlines that provide internet connectivity to their passengers. As of September 30, 2011, Gogo-equipped planes represented approximately 85% of North American aircraft that provide internet connectivity to their passengers. *Approximately 95% of Gogo-equipped planes, representing approximately 42% of our consolidated revenue for the nine months ended September 30, 2011, are contracted under ten-year agreements. Our market leading position also benefits from the exclusive nature of a number of our contracts* and the significant expense and inefficiencies that an airline would incur by switching to another provider.

Gogo's IPO Form S-1 Registration Statement (emphasis added).

28.     As a provider with 85%-90% market share, Gogo's resort to long-term (ten-year) exclusive contracts forecloses a significant portion of the market for a significant period of time, thereby thwarting competition.  The net result is that Gogo's knowledge that it is protected from losing business to competitors on planes on which it has entered into long-term exclusive agreements insulates it from price-constraining competition.  These anti-competitive effects are not justified or offset by overriding procompetitive benefits.  Further, to the extent that any such procompetitive benefits arise from Gogo's resort to long-term, exclusive contracts, those benefits could be achieved through less restrictive means.

29.     If Gogo was not insulated from competition by the terms of the long-term exclusive contracts that it has put in place with many of its airlines, it would face the real prospect that if it attempted to raise or maintain prices for its inflight internet connectivity services above a competitive level, it would lose business to competing inflight internet connectivity providers that the airlines would be free to turn to but presently cannot as a result of the Gogo exclusive contracts that are in effect.

30.     The real nature of that prospect of Gogo, in the absence of its long-term exclusive contracts, losing business to a competing, lower-priced inflight internet connectivity provider, is borne out by the fact Gogo, itself, underscores that, "[o]ur in-flight connectivity and entertainment systems can generally be installed overnight."  Thus, an airline that was presented with a more competitive offering for internet service connectivity aboard its aircraft could readily switch to such a provider without incurring inordinate aircraft downtime or switching

9

costs.  Gogo's long-term and exclusive contracts, however, prevent any of that from happening because, as Gogo boasts in its IPO papers, "[w]e generally have the exclusive right to provide passenger internet connectivity services on Gogo installed aircraft throughout the term of the agreement."

31.     Of course, in a world devoid of Gogo's long-term exclusive contracts, an airline need not decide to actually switch providers in order to constrain Gogo's pricing of its services to passengers.  Rather, the mere prospect that Gogo could lose business to such lower-priced competitors would serve to constrain Gogo's ability to charge supra-competitive pricing and maintain or increase its market share.  This is particularly so given that the competitive offerings now in the market (but unavailable to most domestic airline flights due to Gogo's restrictive agreements) are of superior technological quality than Gogo's ATG-based service, both in terms of the reach of the connectivity (nationwide versus worldwide) and the speed of the connection. In the face of these more advanced and lower-priced competitive offerings, had Gogo not been shielded by the long-term exclusive contracts it employed, it would not be able to maintain or increase its market share, while continuing to charge supra-competitive prices, as it has done.

32.     Gogo's use of long-term, exclusive contracts serves to insulate it from competition, and to cement and protect its monopoly market power.  The net result of Gogo's resort to long-term exclusive contracts is that consumers like Plaintiffs and the members of the class they seek to represent have been denied the benefits of competition, have been left with an inferior product offering, and been subject to a supra-competitive overcharge on their purchases of inflight internet connectivity services.

## CLASS ACTION ALLEGATIONS

33.     Pursuant to Federal Rule of Civil Procedure 23(b)(2)-(3), Plaintiffs bring Counts I-III of this action as a class action on behalf of themselves and all similarly situated consumers who, during the Class Period, purchased inflight internet access connectivity services from defendant Gogo on domestic flights within the United States.  In addition, Plaintiffs bring Counts V and VI of this Class Action Complaint on behalf of a subclass of California consumers of Gogo inflight internet services during the Class Period.  Specifically and explicitly excluded

10

from the class and subclass definitions are defendant Gogo, as well as any of its employees and relatives, affiliates and agents, as well as all federal, state, and local governmental entities, and the judicial officers assigned to this case.  The Class Period for purposes of this Class Action Complaint spans from September 30, 2008 until such date as the Court enters a ruling on whether to certify this action as a class action.  Plaintiffs reserve the right to amend this class and subclass definition as case circumstances warrant.

34.     The class is so numerous that joinder of all putative class members as parties would be impracticable.  Although Plaintiffs are not presently aware of the exact size of the class, Gogo has documented in its IPO registration papers that "[f]rom the inception of our service in August 2008 to September 30, 2011, we provided more than 15 million Gogo sessions to more than 4.4 million registered unique users."  Because the Class Period asserted in this Class Action Complaint goes beyond September 30, 2011, this 4.4 million number of unique registered users is substantially higher.  In any event, the number of purchasers of Gogo's inflight internet services on commercial flights within the United States is so large that joinder would be impracticable, thereby satisfying the numerosity requirement.

35.     The claims of the named Plaintiffs are typical of the claims of the absent class members.  Specifically, during the Class Period, Plaintiffs purchased inflight internet connectivity services from Gogo on domestic airline flights within the United States.  Plaintiffs all allege, as is alleged on behalf of the absent class members, that due to Gogo's unlawful and anti-competitive conduct described herein, they were subject to and paid a supra-competitive price for their purchases from Gogo.  Plaintiffs, therefore, raise the same claims for redress under the Sherman Act and state law, as is typical of the claims of the absent class members.

36.     There are common questions of law and fact that predominate over individual issues applicable to the individual plaintiffs and class members.  Among these common questions of fact and law are the following:

- ✦ the definition of the relevant market(s);

- ✦ defendant's market power within these relevant market(s);

FIRST AMENDED CLASS ACTION
COMPLAINT

✦ whether defendant resorted to unlawful, anti-competitive exclusive contracts to either achieve and/or maintain its monopoly market power in the alleged relevant antitrust market;

✦ whether defendant's practices amounted to an unlawful restraint of trade in violation of Section 1 of the Sherman Act;

✦ whether defendant's practices amounted to unlawful monopolization in violation of Section 2 of the Sherman Act;

✦ whether Plaintiffs and the class members sustained injury to their business and/or property caused by reason of defendant's alleged violations; and

✦ the proper measure of damages and any other remedy.

37.    Plaintiffs are adequate representatives of the interests of the class.  Plaintiffs are member of the proposed class and subclass and have agreed to bring this action on behalf of the interests of the class.  Plaintiffs also have retained competent counsel, experienced in antitrust and class action litigation to zealously and diligently protect the interests of the class members.

38.    A class action is a superior and manageable means of adjudicating this action over individual litigation by each class member, given that the amount at issue for each individual class member is low relative to the cost of bringing suit, such that classwide litigation provides the only realistic alternative for class members to seek judicial redress.  The class action is also manageable in that, by definition, the identity of each Gogo purchaser is known to Gogo, as each such user would be required to complete a registration form online as part of that user's purchase.

39.    Gogo has also acted or refused to act on grounds generally applicable to the class. Gogo has entered into and adhered to exclusive long-term contracts with its contracting airlines that have the purpose and effect of preventing class members, who have been passengers on these airlines, from obtaining their inflight internet connectivity services on the domestic flights of these carriers within the United States, from a source other than Gogo.

FIRST AMENDED CLASS ACTION
COMPLAINT

## COUNT I

### Violation of Section 1 of the Sherman Act, 15 U.S.C. Section 1
### (on Behalf of a Nationwide Class)

40.　　Plaintiffs hereby incorporate by reference paragraphs 1-39 of this Class Action Complaint with the same force and effect as if these paragraphs had been restated here.

41.　　At various times during the Class Period, while passengers on commercial domestic flights within the United States, Plaintiffs purchased inflight internet connectivity services from Gogo.

42.　　Gogo provides inflight internet connectivity services to aircraft operated by nine out of the ten major North American commercial airlines.  In 95% of the commercial aircraft in which Gogo provides such services, it does so subject to long-term, exclusive contracts, of ten years' duration.

43.　　Gogo's market share in the relevant market defined herein is at least, and has at all relevant times, been at least 85%.  Gogo's resort to long-term, exclusive agreements, pursuant to which participating airlines cannot offer inflight internet connectivity services from a provider other than Gogo during the life of the ten-year exclusive agreement, therefore, foreclose competition in a substantial portion of the relevant market for a significant period of time.

44.　　The proximate result, purpose, and effect of Gogo's long-term, exclusive agreements is to foreclose competition in the relevant market, insulate Gogo from actual and potential price-constraining competition, and thereby allow Gogo to charge supra-competitive prices for its inflight internet connectivity services on domestic U.S. flights, as Gogo has, in fact, done.

45.　　Because Gogo's long-term, exclusive agreements unreasonably restrain trade by thwarting competition in a significant share of the market for a significant period of time, they are unlawful agreements in restraint of trade within the meaning of Section 1 of the Sherman Act.   In fact, even though the offerings of competitors Row 44 and ViaSat are of a different and superior technology, defendant Gogo does not take the position that this now-available superior technology from competing providers permits those airlines under an exclusive contract with Gogo to terminate their contract with Gogo.

13

FIRST AMENDED CLASS ACTION
COMPLAINT

46.     As direct purchasers from Gogo, Plaintiffs and the members of the class they seek to represent have been injured in their business or property by Gogo's anti-competitive conduct by, *inter alia*, being subjected to and paying supra-competitive pricing for their inflight internet connectivity purchases from Gogo during the Class Period.

47.     Under Section 4 of the Clayton Act, 15 U.S.C. §15, Plaintiffs and the members of the class they seek to represent, as direct purchasers from Gogo, have standing to and do hereby seek monetary (including treble damages), injunctive and declaratory relief, as well as attorneys' fees and costs, as redress for Gogo's violations of Section 1 of the Sherman Act.

## COUNT II

### Violation of Section 2 of the Sherman Act, 15 U.S.C. Section 2
### (on Behalf of a Nationwide Class for Unlawful Acquisition of Monopoly Power)

48.     Plaintiffs hereby incorporate by reference paragraphs 1-47 of this Class Action Complaint with the same force and effect as if these paragraphs had been restated here.

49.     At various times during the Class Period, while passengers on commercial domestic flights within the United States, Plaintiffs purchased inflight internet connectivity services from Gogo.

50.     Gogo provides inflight internet connectivity services to aircraft operated by nine out of the ten major North American commercial airlines.  In 95% of the commercial aircraft in which Gogo provides such services, it does so subject to long-term, exclusive contracts, of ten years' duration.

51.     Gogo's market share in the relevant market defined herein is at least, and has at all relevant times, been at least 85%.   Gogo, however, acquired that market share and concomitant market power, not through superior business acumen or industry, but rather by resort to long-term, exclusive agreements of ten years' duration, pursuant to which participating airlines cannot offer inflight internet connectivity services from a provider other than Gogo during the life of the ten-year exclusive agreement.

52.     Because Gogo was the first inflight internet connectivity provider to launch such service in the United States in August 2008, Gogo was then able to insist upon and employ long-term, exclusive contracts of ten years' duration to shield itself from competition from later

14

entrants that came along after Gogo's initial launch, even when these subsequent entrants provided superior service and more attractive pricing to the consumer.  The exclusive contracts of ten-years' duration that Gogo put in place with the majority of the airlines and aircraft it serviced has prevented and continues to prevent these actual and potential competitors from being able to participate in a significant segment of the market for a period of several years, and thereby insulated Gogo from price-constraining competition that would exist but for Gogo's adoption of ten-year exclusive contracts in a market in which it has at least an 85% share of the market.

53.     The proximate result, purpose, and effect of Gogo's long-term, exclusive agreements is to have allowed Gogo to accrue a monopoly market share and monopoly market power in the relevant market, foreclose competition in the relevant market, insulate Gogo from actual and potential price-constraining competition, and thereby allow Gogo to charge supra-competitive prices for its inflight internet connectivity services on domestic U.S. flights, as Gogo has, in fact, done.

54.     Because Gogo's monopoly market power was acquired not by resort to superior industry or business acumen, but rather by resort to these anti-competitive agreements, Gogo has engaged in unlawful acquisition of monopoly market power in violation of Section 2 of the Sherman Act.

55.     As direct purchasers from Gogo, Plaintiffs and the members of the class they seek to represent have been injured in their business or property by Gogo's anti-competitive conduct by, *inter alia*, being subjected to and paying supra-competitive pricing for their inflight internet connectivity purchases from Gogo during the Class Period.

56.     Under Section 4 of the Clayton Act, 15 U.S.C. § 15, Plaintiffs and the members of the class they seek to represent, as direct purchasers from Gogo, have standing to and do hereby seek monetary (including treble damages), injunctive and declaratory relief, as well as attorneys' fees and costs, as redress for Gogo's unlawful acquisition of monopoly power and corresponding supra-competitive pricing in violation of Section 2 of the Sherman Act.

FIRST AMENDED CLASS ACTION
COMPLAINT

## COUNT III

### Violation of Section 2 of the Sherman Act, 15 U.S.C. Section 2
### (on Behalf of a Nationwide Class for Unlawful Maintenance of Monopoly)

57.     Plaintiffs hereby incorporate by reference paragraphs 1-56 of this Class Action Complaint with the same force and effect as if these paragraphs had been restated here.

58.     At various times during the Class Period, while passengers on commercial domestic flights within the United States, Plaintiffs purchased inflight internet connectivity services from Gogo.

59.     Gogo provides inflight internet connectivity services to aircraft operated by nine out of the ten major North American commercial airlines.  In 95% of the commercial aircraft in which Gogo provides such services, it does so subject to long-term, exclusive contracts, of ten years' duration.

60.     Gogo's market share in the relevant market defined herein is at least, and has at all relevant times, been at least 85% – a market share that, along with the structure of the market, the barriers to entry, and actions taken by Gogo – has granted Gogo monopoly market power. As is detailed in paragraphs 46-54, *supra*, Gogo is alleged to have acquired this monopoly market power not through superior business acumen or industry, but rather by resort to resort to long-term, exclusive agreements of ten years' duration, pursuant to which participating airlines cannot offer inflight internet connectivity services from a provider other than Gogo during the life of the ten-year exclusive agreement.  Regardless of whether Gogo actually acquired its monopoly market power lawfully or unlawfully, Gogo has continued to maintain its monopoly market power by resort to these long-term exclusive contracts that are still in place, and the earliest of which is not set to expire at least until the year 2018.

61.     Because Gogo was the first inflight internet connectivity provider to launch such service in the United States in August 2008, Gogo was then able to insist upon and employ long-term, exclusive contracts of ten years' duration to shield itself from competition from later entrants that came along after Gogo's initial launch, even when these subsequent entrants provided superior service and more attractive pricing to the consumer.  The exclusive contracts of ten-years' duration that Gogo put in place with the majority of the airlines and aircraft it

16

serviced has prevented and continues to prevent these actual and potential competitors from being able to participate in a significant segment of the market for a period of several years, and thereby insulated Gogo from price-constraining competition that would exist but for Gogo's adoption of ten year exclusive contracts in a market in which it has at least an 85% share of the market.  Now that Gogo has monopoly market power in the relevant market alleged herein, these long-term, exclusive contracts that are still in place now serve to allow Gogo to maintain its monopoly market power, even at a time when rival providers are offering superior products at more attractive pricing to the consumer.

62.    Regardless of how Gogo acquired its monopoly market power, the proximate result, purpose, and effect of Gogo's long-term, exclusive agreements is to have allowed Gogo to maintain the monopoly market share and monopoly market power in the relevant market, and thereby foreclose competition in the relevant market, insulate Gogo from actual and potential price-constraining competition, and to allow Gogo to charge supra-competitive prices for its inflight internet connectivity services on domestic U.S. flights, as Gogo has, in fact, done.

63.    Because Gogo's monopoly market power, however, acquired, has been maintained not by resort to superior industry or business acumen, but rather by resort to these anti-competitive agreements, Gogo has engaged in unlawful maintenance of monopoly market power in violation of Section 2 of the Sherman Act.

64.    As direct purchasers from Gogo, Plaintiffs and the members of the class they seek to represent have been injured in their business or property by Gogo's anti-competitive conduct by, *inter alia*, being subjected to and paying supra-competitive pricing for their inflight internet connectivity purchases from Gogo during the Class Period.

65.    Under Section 4 of the federal Clayton Act, Plaintiffs and the members of the class they seek to represent, as direct purchasers from Gogo, have standing to and do hereby seek monetary (including treble damages), injunctive and declaratory relief, as well as attorneys' fees and costs, as redress for Gogo's unlawful maintenance of monopoly power and corresponding supra-competitive pricing in violation of Section 2 of the Sherman Act.

FIRST AMENDED CLASS ACTION
COMPLAINT

## COUNT IV

**Violations of the California Cartwright Act, Cal. Bus. & Prof. Code Section 16720, *et seq.*
(on Behalf of a California Subclass)**

66. Plaintiffs hereby incorporate by reference paragraphs 1-65 of this Class Action Complaint with the same force and effect as if these paragraphs had been restated here.

67. The same conduct alleged in Count I of this Class Action Complaint as stating a claim for an unlawful agreement in restraint of trade in violation of Section 1 of the Sherman Act also states a claim under the California Cartwright Act.

68. The same conduct alleged in Counts II and III of this Class Action Complaint through which Gogo used long-term exclusive contracts to foreclose competition and thereby unlawfully acquire and/or maintain its monopoly market power, respectively, in violation of Section 2 of the Sherman Act also states a claim under California's Cartwright Act.

69. As direct purchasers from Gogo, Plaintiffs and the members of the class they seek to represent have been injured in their business or property by Gogo's anti-competitive conduct in violation of the California Cartwright Act by, *inter alia*, being subjected to and paying supra-competitive pricing for their inflight internet connectivity purchases from Gogo during the Class Period.

70. Under California Business and Professions Code Section 16750, Plaintiffs and the members of the class they seek to represent, as purchasers from Gogo, have standing to and do hereby seek monetary (including treble damages), injunctive and declaratory relief, as well as attorneys' fees and costs, as redress for Gogo's violation of the Cartwright Act.

## COUNT V

**Violations of California's UCL, Cal. Bus. & Prof. Code Section 17200, *et seq.*
(on Behalf of a California Subclass)**

71. Plaintiffs hereby incorporate by reference paragraphs 1-70 of this Class Action Complaint with the same force and effect as if these paragraphs had been restated here.

72. The conduct engaged in by Gogo, as alleged herein, constitutes "unfair competition" within the meaning of Business & Professions Code Section 17200. Specifically, "unfair competition" is defined to include any "unlawful, unfair or fraudulent business act or

18

FIRST AMENDED CLASS ACTION
COMPLAINT

practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [Bus. & Prof. Code §17500, *et seq.*]."

73.     Defendant committed "unlawful" business acts or practices for, among other reasons, violating California's Cartwright Act, Cal. Bus. & Prof. Code Section 16720, *et seq.*, as well as Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

74.     Defendant committed "unfair" business acts or practices, by among other things:

(a)     engaging in conduct as part of a business practice that is still ongoing;

(b)     engaging in conduct where the utility of such conduct, if any, is outweighed by the gravity of the consequences to Plaintiffs and class Members;

(c)     engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiffs and class Members; and

(d)     engaging in conduct that undermines or violates the spirit or intent of the antitrust consumer protection laws alleged in this Complaint; and

(e)     engaging in conduct that threatens competition at its incipiency by thwarting competition among rival and/or would-be competing inflight internet access service providers within the United States because it forbids airlines subject to Gogo's long-term exclusive contracts from contracting with these actual or would-be competitors of Gogo during the effective term of these long-term exclusive contracts.

75.     Gogo's conduct described herein was undertaken as part of a business practice, and is still ongoing.

76.     Plaintiffs and members of the Class, as direct purchasers of Gogo's inflight internet access services, conveyed money to Gogo in the form of the purchase prices paid to Gogo for the inflight internet services they purchased from Gogo.

77.     Plaintiffs and the class members have standing to and do seek equitable relief against Gogo, including an order of equitable restitution that would restore to Plaintiffs and the class members the interest or moneys conveyed to Gogo during Gogo's unlawful and/or unfair business practices within the Class Period.

FIRST AMENDED CLASS ACTION
COMPLAINT

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the class and subclass pray for judgment from this Court against Defendant, as follows that:

A.     The Court determine that: this action may be maintained as a class action; Plaintiffs and their counsel be designated as class representatives and class counsel, respectively; and reasonable notice of this action be given to the members of the class;

B.     Defendant be permanently enjoined from continuing in any manner the violations alleged in this Class Action Complaint;

C.     Damages be awarded according to proof, that Plaintiffs and the class and subclass be awarded compensatory and treble damages as well as their reasonable attorneys' fees, costs of suit, and disbursements;

D.     Plaintiffs and the class and subclass be awarded pre- and post-judgment interest;

E.     Plaintiffs and the class and subclass obtain such other and further injunctive and declaratory relief as allowed under the Sherman and Clayton Acts, the California Cartwright Act, the California UCL, or other statutes applicable to this Class Action Complaint; and

F.     Plaintiffs and the class and subclass obtain such other and further relief as the Court may deem just and proper.

20

FIRST AMENDED CLASS ACTION
COMPLAINT

1

## DEMAND FOR JURY TRIAL

2          Plaintiffs demand a trial by jury on all counts.

3   DATED:  December 31, 2012                    THE KATRIEL LAW FIRM

4

                                                    /s/ Roy A. Katriel
5                                                ROY A. KATRIEL

6
                                                 ROY A. KATRIEL (265463)
7                                                THE KATRIEL LAW FIRM
                                                 12707 High Bluff Drive, Suite 200
8                                                San Diego, California 92130
                                                 Telephone: (858) 350-4342
9                                                Facsimile:  (858) 430-3719
                                                 e-mail:rak@katriellaw.com
10

11                                               AZRA Z. MEHDI  (220406)
                                                 THE MEHDI LAW FIRM
12                                               One Market
                                                 Spear Tower, Suite 3600
13                                               San Francisco, CA  94105
                                                 Telephone:  (415) 289-8093
14                                               Facsimile:  (310) 289-8001
                                                 E-mail:  azram@themehdifirm.com
15

16                                               RALPH B. KALFAYAN (133464)
                                                 KRAUSE KALFAYAN BENINK
17                                               & SLAVENS LLP
                                                 550 West C Street, Suite 530
18                                               San Diego, CA 92101
                                                 Telephone: (619) 232-0331
19                                               Facsimile:  (619) 232-4019
                                                 e-mail: ralph@kkbs-law.com
20

21                                               *Attorneys for Plaintiffs*

22

23

24

25

26

27

28

21

FIRST AMENDED CLASS ACTION
COMPLAINT