AZRA Z. MEHDI (220406)
THE MEHDI FIRM
One Market
Spear Tower, Suite 3600
San Francisco, CA 94105
Telephone: (415) 293-8039
Facsimile: (415) 293-8001
Email: azram@themehdifirm.com

ROY A. KATRIEL (265463)
THE KATRIEL LAW FIRM
12707 High Bluff Drive, Suite 200
San Diego, CA 92130
Telephone: (858) 350-4342
Facsimile:  (858) 430-3719
Email: rak@katriellaw.com

*Attorneys for Plaintiffs*
*[additional counsel listed on signature block page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JAMES STEWART, JOEL MILNE, AND JOSEPH STRAZZULLO, On Behalf of Themselves and All Others Similarly Situated,

                    Plaintiffs

          vs.

GOGO INC.,

                    Defendant.

Case No.: 3:12-cv-5164-EMC

**FILED UNDER SEAL -- PUBLIC REDATED VERSION**

SECOND AMENDED CLASS ACTION COMPLAINT FOR:

(1) Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

(2) Violations of Section 2 of the Sherman Act, 15 U.S.C. § 2;

(3) Violations of the California Cartwright Act, California Bus. & Prof. Code § 16720, *et seq.*; and

(4) Violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*

DEMAND FOR JURY TRIAL

Pursuant to the Court's Order dated May` 7, 2013 [Dkt. No. 44], Plaintiffs James Stewart, Joel Milne, and Joseph Strazzullo, by and through their undersigned counsel, hereby file their Second Amended Class Action Complaint.

## NATURE OF THE ACTION

1.      Plaintiffs James Stewart, Joel Milne, and Joseph Strazzullo (collectively "Plaintiffs"), by and through their undersigned counsel, hereby bring this action on behalf of themselves and all other similarly situated persons in the United States who, during the Class Period defined herein, have purchased inflight internet access services on domestic commercial airline flights within the continental United States from Defendant Gogo Inc.  ("Gogo"). Plaintiffs seek monetary, equitable, declaratory, and injunctive relief, as well as attorneys' fees and costs, as redress for Gogo's violations of federal antitrust laws and pertinent California statutes.  As detailed herein, Gogo has unlawfully obtained and/or maintained monopoly market power in the United States market for inflight internet connectivity on domestic commercial aircraft by resort to anti-competitive conduct that includes a series of long-term exclusive contracts with the major domestic airlines in the United States.  These exclusive contracts have the purpose and effect of thwarting competition on the merits and on price, and have permitted Gogo to charge consumers like Plaintiffs and the members of the class they seek to represent supra-competitive prices.

## JURISDICTION AND VENUE

2.      Count I of this Second Amended Class Action Complaint states a claim for unlawful agreements in restraint of trade in violation of Section 1 of the Sherman Antitrust Act (the "Sherman Act"), 15 U.S.C. Section 1.  This Court, therefore, has subject-matter jurisdiction over this count pursuant to 28 U.S.C. Sections 1331 and 1337.

3.      Counts II and III of this Second Amended Class Action Complaint state claims for unlawful acquisition and maintenance of monopoly market power, respectively, in violation of Section 2 of the Sherman Act, 15 U.S.C. §2.  This Court, therefore, has subject-matter jurisdiction over these counts pursuant to 28 U.S.C. Sections 1331 and 1337.

1

SECOND AMENDED CLASS ACTION
COMPLAINT

4.     Count IV of this Second Amended Class Action Complaint states a claim on behalf of a subclass of California purchasers of Gogo inflight internet service for Gogo's violations of the California Cartwright Act, Cal. Bus. & Prof. Code §16720, *et seq*.  This Court has supplemental subject-matter jurisdiction over these claims pursuant to 28 U.S.C. Section 1367 because the claims arise from the same nucleus of operative facts as the remaining claims in this Class Action Complaint over which this Court has original federal question subject-matter jurisdiction.

5.     Count V of this Second Amended Class Action Complaint states a claim on behalf of a subclass of California purchasers of Gogo inflight internet service for Gogo's violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code, §17200, *et seq*. (the "UCL").  This Court has supplemental subject-matter jurisdiction over these claims pursuant to 28 U.S.C. Section1367 because the claims arise from the same nucleus of operative facts as the remaining claims in this Class Action Complaint over which this Court has original federal question subject-matter jurisdiction.

6.     This Court also independently has subject-matter jurisdiction over all the counts of this Second Amended Class Action Complaint pursuant to the Class Action Fairness Act, 28 U.S.C. §1332(d), because this is a class action where the citizenship of the class is diverse from the citizenship of defendant, and where the amount in controversy sought exceeds $5 million.

7.     This Court has personal jurisdiction over defendant Gogo because Gogo conducts business within this judicial district, including selling the very services that are at issue in this action to consumers residing within this judicial district. Plaintiff James Stewart is a resident of this judicial district.  Venue, therefore, is proper in this judicial district pursuant to 28 U.S.C. Section 1391.

## PARTIES

8.     Plaintiff James Stewart is a resident of San Francisco County in the State of California.  During the Class Period, Stewart flew on commercial flights within the continental United States on Virgin America, US Airways and Frontier Airlines, and purchased Gogo inflight internet access services for those flights.  Due to Gogo's unlawful actions in violation of

SECOND AMENDED CLASS ACTION
COMPLAINT

the federal antitrust and California statutes, Stewart was subject to a supra-competitive overcharge for his inflight internet access purchases from Gogo. By way of example, just during the year, Plaintiff James Stewart has made purchases of inflight internet access service from Gogo on flights operated by US Airways, Virgin America, Air Tran, American Airlines, and was charged anywhere between $12.95 to $21.95 for these inflight internet access services by Gogo—all at a time when rival inflight internet access service provided by competitor Row 44 on Southwest Airlines, for example, was being offered for $5.00. Due to defendant Gogo's exclusionary and anticompetitive conduct detailed herein, however, Row 44's and other less expensive potential offerings were excluded from the broader market and, hence, were unable to provide price-constraining competition to Gogo's offerings, which have continued to increase in price.

9. Plaintiff Joel Milne is a resident of California. During the Class Period, Milne flew on commercial flights within the continental United States on American Airlines, Virgin America, and US Airways, and repeatedly purchased from Gogo an inflight internet access session that allowed him to access the internet during his flights. Due to Gogo's unlawful actions in violation of the federal antitrust and California statutes, Mr. Milne was subject to a supra-competitive overcharge for his inflight internet access purchases from Gogo. By way of example, in late 2011, Plaintiff Joel Milne purchased inflight internet access service from Gogo on a flight operated by American Airlines, and has was charged $14.95 for this inflight internet access service by Gogo—all at a time when rival inflight internet service access provided by competitor Row 44 on Southwest Airlines, for example, was being offered for $5.00. Due to defendant Gogo's exclusionary and anticompetitive conduct detailed herein, however, Row 44's and other less expensive potential offerings were excluded from the broader market and, hence, were unable to provide price-constraining competition to Gogo's offerings, which have continued to increase in price.

10. Plaintiff Joseph Strazzullo is a resident of California. During the Class Period, Strazzullo flew on commercial flights within the continental United States on American Airlines, Virgin America, and Delta Airlines, and purchased Gogo inflight internet access services for

3

SECOND AMENDED CLASS ACTION
COMPLAINT

those flights.  Due to Gogo's unlawful actions in violation of the federal antitrust and California statutes, Mr. Strazzullo was subject to a supra-competitive overcharge for his inflight internet access purchases from Gogo.  By way of example, since 2010 until mid-2012, Plaintiff Joseph Strazzullo made purchases of inflight internet access service from Gogo on flights operated by Delta, Virgin America, and American Airlines, and has was charged as high as $10.77 for these inflight internet access services by Gogo—all at a time when rival inflight internet service access provided by competitor Row 44 on Southwest Airlines, for example, was being offered for $5.00.  Due to defendant Gogo's exclusionary and anticompetitive conduct detailed herein, however, Row 44's and other less expensive potential offerings were excluded from the broader market and, hence, were unable to provide price-constraining competition to Gogo's offerings, which have continued to increase in price.

11.     Defendant Gogo is a corporation organized under the laws of the State of Delaware, and having its principal place of business at 1250 North Arlington Heights Road, Suite 500, Itasca, Illinois 60143.  Gogo, formerly known as Aircell, touts itself on its website as "the world's leading provider of inflight connectivity."  Since August 2008, Gogo has been providing broadband internet access to passengers on commercial aircraft.  Currently, Gogo internet is the exclusive internet access connectivity provider along domestic commercial airlines routes flown by AirTran, Alaska Airlines, American Airlines, Delta, Frontier Airlines, US Airways, and Virgin America. During the Class Period, Gogo also provided inflight internet access connectivity service to domestic commercial aircraft of United Air Lines.  Gogo currently provides internet access connectivity to nine out of the ten domestic U.S. airlines.  Gogo's share of the market for inflight internet access for commercial domestic flights within the continental United States amounts to at least 85%.  Approximately 95% of Gogo-equipped planes, moreover, are contracted under ten-year exclusive agreements.

## THE RELEVANT MARKET FOR DOMESTIC COMMERCIAL AIRCRAFT INFLIGHT INTERNET CONNECTIVITY

12.     For purposes of this Class Action Complaint, the relevant antitrust market is defined as the market for inflight internet access services on domestic commercial airline flights within the continental United States.  The geographic antitrust market is nationwide.

4

13.     Many passengers on commercial aircraft within the United States demand or desire access to the internet while in flight.  The demand from these passengers has created and supports a market for on-plane internet access connectivity.  For these passengers, there are no readily available substitutes to which they can turn.  Traditional internet service providers cannot provide internet service to plane passengers, both because traditional cellphone towers or underground wires relied upon by such providers are not capable of transmitting a signal to commercial aircraft in flight, and also because current federal legislation or regulations prohibit the transmission of cellphone communication signals in flight.

14.     The regulations, licenses, requirements, and technology necessary and available to offer this inflight internet service in the continental United States is different than the technology and/or licenses or regulations required to offer this service internationally and overwater.  In addition, while domestic passengers for whom having inflight internet access is important may agree to take connecting flights, if necessary, to get from their domestic origin to their domestic destination while maintaining inflight internet service if such service were unavailable on a nonstop domestic flight between those origin and destination cities, it would be unlikely that any significant number of such domestic passengers would agree to travel on flights connecting abroad or through Hawaii solely to be able to attain inflight internet service during their trip, even if such inflight internet service were unavailable on their domestic nonstop route.  Thus, a discrete market exists for antitrust purposes for inflight internet service on domestic commercial flights within the continental United States.

15.     Defendant is a provider of inflight internet access.  It does so, and has done so during the Class Period, by employing its Air-to-Ground ("ATG") network, which is comprised of nationwide cellular towers.  Instead of being designed to transmit signals from land-based tower to land-based tower or to land-based cellular telephones or computers, however, the ATG towers are designed to beam their transmissions in a general vertical direction so that they can communicate with a commercial aircraft in the sky that is equipped with a corresponding ATG antenna and communications unit within the plane.

5

SECOND AMENDED CLASS ACTION
COMPLAINT

16.     While Gogo is a provider, indeed the leading provider with approximately 85% market share, of on-plane internet access connectivity within the continental United States, it is not the only such provider.  For example, a rival company, known as Row 44, also provides on-plane internet connectivity to commercial passengers within the continental United States. Unlike Gogo, which relies on its ATG network of land-based cellular towers to provide its service, Row 44 relies on a satellite-based in-flight broadband platform to provide commercial airline passengers with in-flight internet connectivity at broadband speeds.

17.     Row 44's competing offering has several key technological advantages over the ATG service offered by rival Gogo.  Row 44's service is faster, offering broadband speeds of 11 Mbps TCP/IP, and 28 Mbps UDP to the plane.  In addition, Row 44's satellite-based system allows airlines to offer uninterrupted broadband service across national boundaries, over oceans, and even in more remote regions of the world.  By contrast, Gogo's service, being dependent on land-based cellular towers is limited in its coverage to the region where Gogo has land-based towers installed. Gogo has admitted that it will be unable to offer worldwide coverage until at least 2015.

18.     Row 44's competing offering also has a significant price advantage over Gogo's current service.  During the Class Period, Gogo charged on average approximately $15.00 for passengers wishing to obtain internet access on domestic flights of at least three hours' duration. On some domestic airline carriers, Gogo recently increased this price to $17.95 for flights of three hours' duration or more in which passengers purchase inflight internet access through their laptops, while charging $9.95 for this same flight duration on domestic airline carriers when the inflight internet access is purchase for use on the passenger's mobile device.   More recently, Gogo raised its prices yet again to as high as $21.95 per flight segment, depending on the flight's duration.  By contrast, until recently, Row 44, which is offered on domestic flights operated by Southwest Airlines, offered its service for a price of merely $5.00, regardless of the flight's duration.  Recently, Row 44 raised its price for inflight internet access on Southwest Airlines' flights to $ 8.00, still well below the current price charged by Gogo for its inferior service.

6

SECOND AMENDED CLASS ACTION
COMPLAINT

19.   Besides Row 44, other providers exist that, but for Gogo's actions more fully described below, would offer competing service that would pose price-constraining competition to Gogo's offering.  For example, ViaSat is yet another provider offering a satellite-based system capable of providing inflight broadband internet access to commercial airline passengers. Recently, JetBlue, a U.S. low-cost domestic airline carrier announced that it will be offering inflight internet broadband access to its passengers through its partnership with ViaSat. JetBlue expected to launch the system in its aircraft in 2012, pending Federal Aviation Administration certification, but that launch date has been repeatdly delayed and no inflight internet service is currently offered on JetBlue flights.

20.   Despite the existence of competing offerings and the potential for competing offerings from other providers, Gogo has managed to deny consumers the benefits of this actual and potential competition that would exist but for the actions that Gogo has taken and that are detailed below.

## GOGO'S MONOPOLY MARKET POWER AND ANTI-COMPETITIVE ACTIONS TO OBTAIN OR MAINTAIN IT

21.   In late 2011, Gogo filed registration papers required by the Securities and Exchange Commission in connection with its planned Initial Public Offering ("IPO").  Those publicly filed papers document that Gogo claimed that of all commercial domestic aircraft equipped with inflight internet service access, Gogo serviced 85% of these aircraft.  In fact, by now, and since the time that those papers were filed, it is likely that Gogo's market share has risen to approximately 90% because, upon information and belief, additional airplanes that were contracted to be outfitted with Gogo's equipment have been so equipped.

22.   But Gogo's market share goes beyond the 85% of domestic aircraft that are actually equipped to provide inflight internet service that is referenced in Gogo's initial IPO papers.    In fact, Gogo possesses at least an 85% market share of *all* commercial aircraft servicing flights within the continental United States because Gogo has entered into long-term exclusive agreements with most domestic carriers pursuant to which Gogo is the exclusive provider permitted to provide internet service for these carrier's entire or near entire fleet.  Thus,

7

SECOND AMENDED CLASS ACTION
COMPLAINT

even though some of these carriers' whole fleets have yet to be provisioned with inflight internet access service because the installation work has yet to take place or for other reasons, Gogo's contracts still lock up these planes for Gogo exclusively.   The particulars of these Gogo exclusive contracts are detailed at paragraphs 24-51 below, and are attached as Exhibits 1-8 hereto.

23.     Thus, given Gogo's exclusive contracts with the overwhelming majority of domestic airline carriers, and given that these exclusive contracts do not apply on an airplane-by-airplane basis but rather apply across a carrier's entire or near entire domestic fleet, the Gogo exclusive contracts have permitted Gogo to foreclose competition and obtain and/or maintain monopoly market power in the relevant market for inflight internet access service on commercial airline flights within the continental United States.

### GOGO'S CONTRACTS WITH DOMESTIC CARRIERS

24.

SECOND AMENDED CLASS ACTION
COMPLAINT



SECOND AMENDED CLASS ACTION
COMPLAINT

1
2
3
4
5
6
7
http://www.gogoair.com/gogo/cms/virgin.do
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SECOND AMENDED CLASS ACTION
COMPLAINT



http://www.aa.com/i18n/urls/entertainmentOnDemand.jsp#wi-fi

SECOND AMENDED CLASS ACTION
COMPLAINT



SECOND AMENDED CLASS ACTION
COMPLAINT

http://en.wikipedia.org/wiki/Delta_Air_Lines_fleet [redacted]

[redacted]

[redacted]

---

2 [redacted]

[redacted]

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20
http://en.wikipedia.org/wiki/US_Airways_fleet

21

22

23

24

25

26

27

28

SECOND AMENDED CLASS ACTION
COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21 http://www.united.com/web/en-
us/content/travel/inflight/premiumservices.aspx
22
23
24
25
26
27 http://en.wikipedia.org/wiki/US_Airways_fleet .
28

15

SECOND AMENDED CLASS ACTION
COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



**THE HIGH BARRIERS TO ENTRY**

52.     Gogo's fleetwide or near fleetwide exclusive contract with the foregoing domestic

SECOND AMENDED CLASS ACTION
COMPLAINT

carriers means that it possesses and, during the Class Period, has possessed a market share of 85 % or higher of the relevant market for inflight internet access services on domestic airline flights within the continental United States.

53.     The market for inflight internet connectivity on domestic commercial flights within the continental United States is characterized by high barriers to entry.  Among these high entry barriers are the high cost of infrastructure required to build a network capable of offering inflight internet connectivity.   Further, the market is characterized by restrictive legal and regulatory hurdles that serve to limit competitive entry.  For land-based systems, such as Gogo's ATG network, the Federal Communications Commission ("FCC") must provide and approve the required frequency spectrum for such transmissions to take place.   No further auctioning of ownership or use rights of frequency spectrums capable of transmitting broadband signals to aircraft are planned to be auctioned off by the FCC until at least the year 2016, thereby making Gogo the exclusive holder of an aircraft-capable frequency spectrum for the foreseeable future. Resort to a satellite-based system is costly and requires partnering with a satellite launching company, as has been done by Row 44.  Moreover, Gogo's use of long-term (typically ten-year) exclusive contracts that legally prevent contracting airline carriers from employing any inflight internet connectivity provider, other than Gogo, during the ten-year duration of Gogo's contract, poses another high entry barrier.  In the face of this long-term exclusivity that Gogo has secured with respect to the 95% of the commercial aircraft it currently serves, few would-be entrants would find it financially feasible to incur the costs and clear the legal hurdles required for entry into the market when they know that, even upon doing so, the existence of these long-term, exclusive contracts, would prevent these new would-be entrants from being able to take appreciable business away from Gogo in the foreseeable future.

54.     With the exception of Southwest Airlines, Gogo has managed to secure contracts to provide internet access to all other major U.S. airlines that currently offer in-plane internet access, including: AirTran, Alaska Airlines, American Airlines, Delta, Frontier Airlines, United Airlines, US Airways, and Virgin America.

55.     The high barriers to entry into this relevant market is also evidenced by the fact

17

that ViaSat, who was initially touted to provide inflight internet service to JetBlue flights as early as 2011, has seen its planned entry repeatedly and significantly delayed, so much so, that despite the foregoing announcement, ViaSat has yet to successfully enter the market or provide any inflight internet service on any domestic JetBlue flights.

### GOGO'S MONOPOLY MARKET POWER

56.     Rather than achieving or maintaining its monopoly market power through innovation or competition on the merits, however, Gogo has achieved or maintained its dominant market power by resorting to anti-competitive agreements with the airlines on whose planes Gogo's equipment is placed.    These agreements take the form of long-term exclusive agreements, typically of ten years' duration, during which the contracting airline agrees to contract only with Gogo for inflight internet connectivity services across its entire or near entire domestic fleet, to the exclusion of any and all competitors that currently exist or that may exist during the duration of these exclusive ten-year contracts.

57.     With Gogo's service first having launched in August 2008, the first of these Gogo exclusive contracts is not set to expire until the year 2018.  Until that time, planes equipped with Gogo's equipment subject to these agreements cannot turn to a competing provider, even if that competitor were to offer (as Row 44 currently does) either more attractive technological features, better pricing, or both to the airline's passengers.

58.     Gogo has, in fact, exercised this monopoly market power, as is evidenced, for example, by its continuous and repeated raising of prices of its own internet inflight internet access service, which now are priced at as high as $21.95 plus taxes and fees (for a service that was initially priced at as low as $7.95 or $9.95 when it launched just a few years ago), even at a time when competing services with little market share were offered for as low as $5.00 or $8.00 per flight on, for example, Southwest Airlines.  Gogo's ability to and actual increase in prices at a time when competing offerings were available on other planes at significant lower prices indicates that, due to these competing offerings' low market share, they did not pose any meaningful price-constraining competition to Gogo's offerings.

SECOND AMENDED CLASS ACTION
COMPLAINT

59.     Gogo's exclusive contracts that apply on a fleetwide or near fleetwide basis also serve to reduce output.  In the absence of these fleetwide or near fleetwide exclusive agreements, other rivals, like Row 44, could manufacture and attempt to sell competing products to some of these carriers' domestic aircraft.   But, given the existence and effect of Gogo's exclusive contracts, rivals like Row 44 are unable to do so, and hence the exclusive contracts effectively take these otherwise existing products off that portion of the market.

60.     Gogo, itself has admitted in its IPO papers, that its long-term exclusive contracts are a key weapon that allows it to maintain what it calls its "strong incumbent position." Therein, Gogo touts to potential investors that:

> ***Strong Incumbent Position***. We are the world's leading provider of in-flight connectivity to the commercial aviation market and a leading provider of in-flight internet connectivity and other voice and data communications equipment and services to the business aviation market.  In our CA [commercial aviation] business, we currently provide Gogo Connectivity to passengers on nine of the ten North American airlines that provide internet connectivity to their passengers. As of September 30, 2011, Gogo-equipped planes represented approximately 85% of North American aircraft that provide internet connectivity to their passengers. ***Approximately 95% of Gogo-equipped planes, representing approximately 42% of our consolidated revenue for the nine months ended September 30, 2011, are contracted under ten-year agreements. Our market leading position also benefits from the exclusive nature of a number of our contracts*** and the significant expense and inefficiencies that an airline would incur by switching to another provider.

Gogo's IPO Form S-1 Registration Statement (emphasis added).

61.     As a provider with at least 85% market share, Gogo's resort to long-term (mostly ten-year) exclusive contracts forecloses a significant portion of the market for a significant period of time, thereby thwarting competition.  The net result is that Gogo's knowledge that it is protected from losing business to competitors on planes on which it has entered into long-term exclusive agreements insulates it from price-constraining competition.  These anti-competitive effects are not justified or offset by overriding procompetitive benefits.  Further, to the extent that any such procompetitive benefits arise from Gogo's resort to long-term, exclusive contracts, those benefits could be achieved through less restrictive means.

SECOND AMENDED CLASS ACTION
COMPLAINT

62. If Gogo was not insulated from competition by the terms of the long-term exclusive contracts that it has put in place with many of its airlines, it would face the real prospect that if it attempted to raise or maintain prices for its inflight internet connectivity services above a competitive level, it would lose business to competing inflight internet connectivity providers that the airlines would be free to turn to but presently cannot as a result of the Gogo exclusive contracts that are in effect.

63. The real nature of that prospect of Gogo, in the absence of its long-term exclusive contracts, losing business to a competing, lower-priced inflight internet connectivity provider, is borne out by the fact Gogo, itself, underscores that, "[o]ur in-flight connectivity and entertainment systems can generally be installed overnight." Thus, an airline that was presented with a more competitive offering for internet service connectivity aboard its aircraft could readily switch to such a provider without incurring inordinate aircraft downtime or switching costs. Gogo's long-term and exclusive contracts, however, prevent any of that from happening because, as Gogo boasts in its IPO papers, "[w]e generally have the exclusive right to provide passenger internet connectivity services on Gogo installed aircraft throughout the term of the agreement."

64. Of course, in a world devoid of Gogo's long-term exclusive contracts, an airline need not decide to actually switch providers in order to constrain Gogo's pricing of its services to passengers. Rather, the mere prospect that Gogo could lose business to such lower-priced competitors would serve to constrain Gogo's ability to charge supra-competitive pricing and maintain or increase its market share. This is particularly so given that the competitive offerings now in the market (but unavailable to most domestic airline flights due to Gogo's restrictive agreements) are of superior technological quality than Gogo's ATG-based service, both in terms of the reach of the connectivity (nationwide versus worldwide) and the speed of the connection. In the face of these more advanced and lower-priced competitive offerings, had Gogo not been shielded by the long-term exclusive contracts it employed, it would not be able to maintain or increase its market share, while continuing to charge supra-competitive prices, as it has done.

65. Gogo's use of long-term, exclusive contracts serves to insulate it from

SECOND AMENDED CLASS ACTION
COMPLAINT

competition, and to cement and protect its monopoly market power.  The net result of Gogo's resort to long-term exclusive contracts is that consumers like Plaintiffs and the members of the class they seek to represent have been denied the benefits of competition, have been left with an inferior product offering, and been subject to a supra-competitive overcharge on their purchases of inflight internet connectivity services.

## CLASS ACTION ALLEGATIONS

66.     Pursuant to Federal Rule of Civil Procedure 23(b)(2)-(3), Plaintiffs bring Counts I-III of this action as a class action on behalf of themselves and all similarly situated consumers who, during the Class Period, purchased inflight internet access connectivity services from defendant Gogo on domestic flights within the continental United States.  In addition, Plaintiffs bring Counts V and VI of this Class Action Complaint on behalf of a subclass of California consumers of Gogo inflight internet services during the Class Period.  Specifically and explicitly excluded from the class and subclass definitions are defendant Gogo, as well as any of its employees and relatives, affiliates and agents, as well as all federal, state, and local governmental entities, and the judicial officers assigned to this case.  The Class Period for purposes of this Class Action Complaint spans from September 30, 2008 until such date as the Court enters a ruling on whether to certify this action as a class action.  Plaintiffs reserve the right to amend this class and subclass definition as case circumstances warrant.

67.     The class is so numerous that joinder of all putative class members as parties would be impracticable.  Although Plaintiffs are not presently aware of the exact size of the class, Gogo has documented in its IPO registration papers that "[f]rom the inception of our service in August 2008 to September 30, 2011, we provided more than 15 million Gogo sessions to more than 4.4 million registered unique users."  Because the Class Period asserted in this Class Action Complaint goes beyond September 30, 2011, this 4.4 million number of unique registered users is substantially higher.  In any event, the number of purchasers of Gogo's inflight internet services on commercial flights within the United States is so large that joinder would be impracticable, thereby satisfying the numerosity requirement.

68.     The claims of the named Plaintiffs are typical of the claims of the absent class

21

SECOND AMENDED CLASS ACTION
COMPLAINT

members.   Specifically, during the Class Period, Plaintiffs purchased inflight internet connectivity services from Gogo on domestic airline flights within the continental United States. Plaintiffs all allege, as is alleged on behalf of the absent class members, that due to Gogo's unlawful and anti-competitive conduct described herein, they were subject to and paid a supra-competitive price for their purchases from Gogo.   Plaintiffs, therefore, raise the same claims for redress under the Sherman Act and state law, as is typical of the claims of the absent class members.

69.    There are common questions of law and fact that predominate over individual issues applicable to the individual plaintiffs and class members.   Among these common questions of fact and law are the following:

- the definition of the relevant market(s);
- defendant's market power within these relevant market(s);
- whether defendant resorted to unlawful, anti-competitive exclusive contracts to either achieve and/or maintain its monopoly market power in the alleged relevant antitrust market;
- whether defendant's practices amounted to an unlawful restraint of trade in violation of Section 1 of the Sherman Act;
- whether defendant's practices amounted to unlawful monopolization in violation of Section 2 of the Sherman Act;
- whether Plaintiffs and the class members sustained injury to their business and/or property caused by reason of defendant's alleged violations; and
- the proper measure of damages and any other remedy.

70.    Plaintiffs are adequate representatives of the interests of the class.   Plaintiffs are member of the proposed class and subclass and have agreed to bring this action on behalf of the interests of the class.   Plaintiffs also have retained competent counsel, experienced in antitrust and class action litigation to zealously and diligently protect the interests of the class members.

71.    A class action is a superior and manageable means of adjudicating this action over individual litigation by each class member, given that the amount at issue for each individual

SECOND AMENDED CLASS ACTION
COMPLAINT

class member is low relative to the cost of bringing suit, such that classwide litigation provides the only realistic alternative for class members to seek judicial redress.  The class action is also manageable in that, by definition, the identity of each Gogo purchaser is known to Gogo, as each such user would be required to complete a registration form online as part of that user's purchase.

72.    Gogo has also acted or refused to act on grounds generally applicable to the class. Gogo has entered into and adhered to exclusive long-term contracts with its contracting airlines that have the purpose and effect of preventing class members, who have been passengers on these airlines, from obtaining their inflight internet connectivity services on the domestic flights of these carriers within the continental United States, from a source other than Gogo.

## COUNT I

### Violation of Section 1 of the Sherman Act, 15 U.S.C. Section 1
### (on Behalf of a Nationwide Class)

73.    Plaintiffs hereby incorporate by reference paragraphs 1-72 of this Class Action Complaint with the same force and effect as if these paragraphs had been restated here.

74.    At various times during the Class Period, while passengers on commercial domestic flights within the continental United States, Plaintiffs purchased inflight internet connectivity services from Gogo.

75.    Gogo provides inflight internet connectivity services to aircraft operated by nine out of the ten major North American commercial airlines.  In 95% of the commercial aircraft in which Gogo provides such services, it does so subject to long-term, exclusive contracts, of ten years' duration.

76.    Gogo's market share in the relevant market defined herein is at least, and has at all relevant times, been at least 85%.  Gogo's resort to long-term, exclusive agreements, pursuant to which participating airlines cannot offer inflight internet connectivity services from a provider other than Gogo in their entire or near entire domestic fleets during the life of the exclusive agreements, therefore, foreclose competition in a substantial portion of the relevant market for a

23

SECOND AMENDED CLASS ACTION
COMPLAINT

significant period of time.

77.     The proximate result, purpose, and effect of Gogo's long-term, exclusive agreements is to foreclose competition in the relevant market, insulate Gogo from actual and potential price-constraining competition, and thereby allow Gogo to charge supra-competitive prices for its inflight internet connectivity services on domestic U.S. flights, as Gogo has, in fact, done.

78.     Because Gogo's long-term, exclusive agreements unreasonably restrain trade by thwarting competition in a significant share of the market for a significant period of time, they are unlawful agreements in restraint of trade within the meaning of Section 1 of the Sherman Act.   In fact, even though the offerings of actual or potential competitors Row 44 and ViaSat are of a different and superior technology, defendant Gogo does not take the position that this now-available superior technology from competing providers permits those airlines under an exclusive contract with Gogo to terminate their contract with Gogo.

79.     As direct purchasers from Gogo, Plaintiffs and the members of the class they seek to represent have been injured in their business or property by Gogo's anti-competitive conduct by, *inter alia*, being subjected to and paying supra-competitive pricing for their inflight internet connectivity purchases from Gogo during the Class Period.

80.     Under Section 4 of the Clayton Act, 15 U.S.C. §15, Plaintiffs and the members of the class they seek to represent, as direct purchasers from Gogo, have standing to and do hereby seek monetary (including treble damages), injunctive and declaratory relief, as well as attorneys' fees and costs, as redress for Gogo's violations of Section 1 of the Sherman Act.

## COUNT II

**Violation of Section 2 of the Sherman Act, 15 U.S.C. Section 2**
**(on Behalf of a Nationwide Class for Unlawful Acquisition of Monopoly Power)**

81.     Plaintiffs hereby incorporate by reference paragraphs 1-80 of this Class Action Complaint with the same force and effect as if these paragraphs had been restated here.

82.     At various times during the Class Period, while passengers on commercial domestic flights within the continental United States, Plaintiffs purchased inflight internet connectivity services from Gogo.

24

SECOND AMENDED CLASS ACTION
COMPLAINT

83.     Gogo provides inflight internet connectivity services to aircraft operated by nine out of the ten major North American commercial airlines.  In 95% of the commercial aircraft in which Gogo provides such services, it does so subject to long-term, exclusive contracts, of ten years' duration.

84.     Gogo's market share in the relevant market defined herein is at least, and has at all relevant times, been at least 85%.  Gogo, however, acquired that market share and concomitant market power, not through superior business acumen or industry, but rather by resort to long-term, exclusive agreements, pursuant to which participating airlines cannot offer inflight internet connectivity services on their entire or near entire domestic fleets from a provider other than Gogo during the life of the exclusive agreements.

85.     Because Gogo was the first inflight internet connectivity provider to launch such service in the United States in August 2008, Gogo was then able to insist upon and employ long-term, exclusive contracts to shield itself from competition from later entrants that came along after Gogo's initial launch, even when these subsequent entrants provided superior service and more attractive pricing to the consumer.  The exclusive contracts that Gogo put in place with the majority of the airlines and aircraft it serviced has prevented and continues to prevent these actual and potential competitors from being able to participate in a significant segment of the market for a period of several years, and thereby insulated Gogo from price-constraining competition that would exist but for Gogo's adoption of long-term exclusive contracts in a market in which it has at least an 85% share of the market.

86.     The proximate result, purpose, and effect of Gogo's long-term, exclusive agreements is to have allowed Gogo to accrue a monopoly market share and monopoly market power in the relevant market, foreclose competition in the relevant market, insulate Gogo from actual and potential price-constraining competition, and thereby allow Gogo to charge supra-competitive prices for its inflight internet connectivity services on domestic U.S. flights, as Gogo has, in fact, done.

87.     Because Gogo's monopoly market power was acquired not by resort to superior industry or business acumen, but rather by resort to these anti-competitive agreements, Gogo has

SECOND AMENDED CLASS ACTION
COMPLAINT

engaged in unlawful acquisition of monopoly market power in violation of Section 2 of the Sherman Act.

88.     As direct purchasers from Gogo, Plaintiffs and the members of the class they seek to represent have been injured in their business or property by Gogo's anti-competitive conduct by, *inter alia*, being subjected to and paying supra-competitive pricing for their inflight internet connectivity purchases from Gogo during the Class Period.

89.     Under Section 4 of the Clayton Act, 15 U.S.C. § 15, Plaintiffs and the members of the class they seek to represent, as direct purchasers from Gogo, have standing to and do hereby seek monetary (including treble damages), injunctive and declaratory relief, as well as attorneys' fees and costs, as redress for Gogo's unlawful acquisition of monopoly power and corresponding supra-competitive pricing in violation of Section 2 of the Sherman Act.

<u>**COUNT III**</u>

**Violation of Section 2 of the Sherman Act, 15 U.S.C. Section 2
(on Behalf of a Nationwide Class for Unlawful Maintenance of Monopoly)**

90.     Plaintiffs hereby incorporate by reference paragraphs 1-88 of this Class Action Complaint with the same force and effect as if these paragraphs had been restated here.

91.     At various times during the Class Period, while passengers on commercial domestic flights within the United States, Plaintiffs purchased inflight internet connectivity services from Gogo.

92.     Gogo provides inflight internet connectivity services to aircraft operated by nine out of the ten major North American commercial airlines.  In 95% of the commercial aircraft in which Gogo provides such services, it does so subject to long-term, exclusive contracts, of ten years' duration.

93.     Gogo's market share in the relevant market defined herein is at least, and has at all relevant times, been at least 85% – a market share that, along with the structure of the market, the barriers to entry, and actions taken by Gogo – has granted Gogo monopoly market power. As already detailed herein, Gogo is alleged to have acquired this monopoly market power not through superior business acumen or industry, but rather by resort to resort to long-term,

26

exclusive agreements, pursuant to which participating airlines cannot offer inflight internet connectivity services from a provider other than Gogo on their entire or near entire domestic fleets during the life of the exclusive agreements.  Regardless of whether Gogo actually acquired its monopoly market power lawfully or unlawfully, Gogo has continued to maintain its monopoly market power by resort to these long-term exclusive contracts that are still in place, and the earliest of which is not set to expire at least until the year 2018.

94.     Because Gogo was the first inflight internet connectivity provider to launch such service in the United States in August 2008, Gogo was then able to insist upon and employ long-term, exclusive contracts of ten years' duration to shield itself from competition from later entrants that came along after Gogo's initial launch, even when these subsequent entrants provided superior service and more attractive pricing to the consumer.  The exclusive contracts that Gogo put in place with the majority of the airlines and aircraft it serviced has prevented and continues to prevent these actual and potential competitors from being able to participate in a significant segment of the market for a period of several years, and thereby insulated Gogo from price-constraining competition that would exist but for Gogo's adoption of long-term exclusive contracts in a market in which it has at least an 85% share of the market.  Now that Gogo has monopoly market power in the relevant market alleged herein, these long-term, exclusive contracts that are still in place now serve to allow Gogo to maintain its monopoly market power, even at a time when rival providers are offering superior products at more attractive pricing to the consumer.

95.     Regardless of how Gogo acquired its monopoly market power, the proximate result, purpose, and effect of Gogo's long-term, exclusive agreements is to have allowed Gogo to maintain the monopoly market share and monopoly market power in the relevant market, and thereby foreclose competition in the relevant market, insulate Gogo from actual and potential price-constraining competition, and to allow Gogo to charge supra-competitive prices for its inflight internet connectivity services on domestic U.S. flights, as Gogo has, in fact, done.

96.     Because Gogo's monopoly market power, however, acquired, has been maintained not by resort to superior industry or business acumen, but rather by resort to these

27

SECOND AMENDED CLASS ACTION
COMPLAINT

anti-competitive agreements, Gogo has engaged in unlawful maintenance of monopoly market power in violation of Section 2 of the Sherman Act.

97.     As direct purchasers from Gogo, Plaintiffs and the members of the class they seek to represent have been injured in their business or property by Gogo's anti-competitive conduct by, *inter alia*, being subjected to and paying supra-competitive pricing for their inflight internet connectivity purchases from Gogo during the Class Period.

98.     Under Section 4 of the federal Clayton Act, Plaintiffs and the members of the class they seek to represent, as direct purchasers from Gogo, have standing to and do hereby seek monetary (including treble damages), injunctive and declaratory relief, as well as attorneys' fees and costs, as redress for Gogo's unlawful maintenance of monopoly power and corresponding supra-competitive pricing in violation of Section 2 of the Sherman Act.

## **COUNT IV**

### **Violations of the California Cartwright Act, Cal. Bus. & Prof. Code Section 16720, *et seq.* (on Behalf of a California Subclass)**

99.     Plaintiffs hereby incorporate by reference paragraphs 1-98 of this Class Action Complaint with the same force and effect as if these paragraphs had been restated here.

100.    The same conduct alleged in Count I of this Class Action Complaint as stating a claim for an unlawful agreement in restraint of trade in violation of Section 1 of the Sherman Act also states a claim under the California Cartwright Act.

101.    The same conduct alleged in Counts II and III of this Class Action Complaint through which Gogo used long-term exclusive contracts to foreclose competition and thereby unlawfully acquire and/or maintain its monopoly market power, respectively, in violation of Section 2 of the Sherman Act also states a claim under California's Cartwright Act.

102.    As direct purchasers from Gogo, Plaintiffs and the members of the class they seek to represent have been injured in their business or property by Gogo's anti-competitive conduct in violation of the California Cartwright Act by, *inter alia*, being subjected to and paying supra-competitive pricing for their inflight internet connectivity purchases from Gogo during the Class

28

SECOND AMENDED CLASS ACTION COMPLAINT

Period.

103.   Under California Business and Professions Code Section 16750, Plaintiffs and the members of the class they seek to represent, as purchasers from Gogo, have standing to and do hereby seek monetary (including treble damages), injunctive and declaratory relief, as well as attorneys' fees and costs, as redress for Gogo's violation of the Cartwright Act.

### COUNT V

**Violations of California's UCL, Cal. Bus. & Prof. Code Section 17200, *et seq*.**
**(on Behalf of a California Subclass)**

104.   Plaintiffs hereby incorporate by reference paragraphs 1-103 of this Class Action Complaint with the same force and effect as if these paragraphs had been restated here.

105.   The conduct engaged in by Gogo, as alleged herein, constitutes "unfair competition" within the meaning of Business & Professions Code Section 17200.  Specifically, "unfair competition" is defined to include any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [Bus. & Prof. Code §17500, *et seq*.]."

106.   Defendant committed "unlawful" business acts or practices for, among other reasons, violating California's Cartwright Act, Cal. Bus. & Prof. Code Section 16720, *et seq*., as well as Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

107.   Defendant committed "unfair" business acts or practices, by among other things:

(a)   engaging in conduct as part of a business practice that is still ongoing;

(b)   engaging in conduct where the utility of such conduct, if any, is outweighed by the gravity of the consequences to Plaintiffs and class Members;

(c)   engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiffs and class Members; and

(d)   engaging in conduct that undermines or violates the spirit or intent of the antitrust consumer protection laws alleged in this Complaint; and

(e)   engaging in conduct that threatens competition at its incipiency by thwarting competition among rival and/or would-be competing inflight internet access service

29

SECOND AMENDED CLASS ACTION
COMPLAINT

providers within the United States because it forbids airlines subject to Gogo's long-term exclusive contracts from contracting with these actual or would-be competitors of Gogo during the effective term of these long-term exclusive contracts.

108.    Gogo's conduct described herein was undertaken as part of a business practice, and is still ongoing.

109.    Plaintiffs and members of the Class, as direct purchasers of Gogo's inflight internet access services, conveyed money to Gogo in the form of the purchase prices paid to Gogo for the inflight internet services they purchased from Gogo.

110.    Plaintiffs and the class members have standing to and do seek equitable relief against Gogo, including an order of equitable restitution that would restore to Plaintiffs and the class members the interest or moneys conveyed to Gogo during Gogo's unlawful and/or unfair business practices within the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the class and subclass pray for judgment from this Court against Defendant, as follows that:

A.    The Court determine that: this action may be maintained as a class action; Plaintiffs and their counsel be designated as class representatives and class counsel, respectively; and reasonable notice of this action be given to the members of the class;

B.    Defendant be permanently enjoined from continuing in any manner the violations alleged in this Class Action Complaint;

C.    Damages be awarded according to proof, that Plaintiffs and the class and subclass be awarded compensatory and treble damages as well as their reasonable attorneys' fees, costs of suit, and disbursements;

D.    Plaintiffs and the class and subclass be awarded pre- and post-judgment interest;

E.    Plaintiffs and the class and subclass obtain such other and further injunctive and declaratory relief as allowed under the Sherman and Clayton Acts, the California Cartwright Act, the California UCL, or other statutes applicable to this Class Action Complaint; and

30

SECOND AMENDED CLASS ACTION
COMPLAINT

F.     Plaintiffs and the class and subclass obtain such other and further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all counts.

DATED:  August 29, 2013                    THE KATRIEL LAW FIRM


                                                             /s/ Roy A. Katriel
                                                          ROY A. KATRIEL


                                           ROY A. KATRIEL (265463)
                                           THE KATRIEL LAW FIRM
                                           12707 High Bluff Drive, Suite 200
                                           San Diego, California 92130
                                           Telephone: (858) 350-4342
                                           Facsimile:  (858) 430-3719
                                           e-mail:rak@katriellaw.com

                                           AZRA Z. MEHDI  (220406)
                                           THE MEHDI FIRM
                                           One Market
                                           Spear Tower, Suite 3600
                                           San Francisco, CA  94105
                                           Telephone:  (415) 289-8093
                                           Facsimile:  (310) 289-8001
                                           E-mail:  azram@themehdifirm.com

                                           RALPH B. KALFAYAN (133464)
                                           KRAUSE KALFAYAN BENINK
                                           & SLAVENS LLP
                                           550 West C Street, Suite 530
                                           San Diego, CA 92101
                                           Telephone: (619) 232-0331
                                           Facsimile:  (619) 232-4019
                                           e-mail: ralph@kkbs-law.com

                                           *Attorneys for Plaintiffs*

31

SECOND AMENDED CLASS ACTION
COMPLAINT