Pages 1 - 40

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE


JAMES STEWART, et al.,           )
                                 )
                Plaintiffs,      )
                                 )   No. C-12-5164 EMC
     vs.                         )
                                 )
GOGO, INC.,                      )
                                 )   San Francisco, California
                                 )   Thursday, January 23, 2014
                Defendant.       )   3:06 p.m.
                                 )
_____)


**TRANSCRIPT OF PROCEEDINGS**


**APPEARANCES**:

For Plaintiffs:          The Katriel Law Firm
                         4225 Executive Square, Suite 600
                         La Jolla, California 92037
                 BY:  **ROY ARIE KATRIEL, ATTORNEY AT LAW**


                         Krause, Kalfayan, Benink & Slavens
                         550 West C Street, Suite 530
                         San Diego, California 92101
                 BY:  **RALPH B. KALFAYAN, ATTORNEY AT LAW**


                (APPEARANCES CONTINUED ON FOLLOWING PAGE.)


Reported By:  Sarah Goekler, CSR 13446, RPR
              Court Reporter Pro Tem

1    **<u>APPEARANCES</u>:** (CONTINUED)

2    For Defendant:            Shearman & Sterling, LLP
                               Four Embarcadero Center, Suite 3800
3                              San Francisco, California 94111
                      **BY:   JAMES DONATO, ATTORNEY AT LAW**
4                             **MIKAEL A. ABYE, ATTORNEY AT LAW**

5

6                              ---o0o---

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   Thursday, January 23, 2014                      3:06 p.m.
 2                      P R O C E E D I N G S
 3          THE CLERK:  Calling case C-12-5164, Stewart versus
 4   Gogo.
 5      Counsel, please come to the podium and state your
 6   appearances.
 7          MR. KATRIEL:  Good afternoon, Your Honor.  Roy
 8   Katriel on behalf of the plaintiffs.
 9          THE COURT:  All right.  Thank you, Mr. Katriel.
10          MR. KALFAYAN:  Good afternoon, Your Honor.  Ralph
11   Kalfayan on behalf of the plaintiffs.
12          THE COURT:  Thank you, Mr. Kalfayan.
13          MR. DONATO:  Good afternoon, Your Honor.  Jim Donato
14   for Gogo.
15          THE COURT:  Thank you, Mr. Donato.
16          MR. ABYE:  Good afternoon, Your Honor.  Mik Abye of
17   Shearman & Sterling for Gogo.
18          THE COURT:  All right.  Good afternoon, Mr. Abye.
19      So we're on for defendant's motion to dismiss the second
20   amended complaint, and I guess some things have evolved since
21   the last time we were here.  I understand that there is now
22   some information about the nature of the contracts with some of
23   the airlines.
24      The critical question is whether the plaintiff has stated
25   a cause of action under the Sherman Act for an exclusive or
```

1    unlawful exclusive dealing arrangement.

2        And the critical question, seems to me, is whether the

3    effect of these arrangements is to foreclose competition in a

4    substantial share of the line of commerce affected, and, you

5    know, we have some information.  It appears that out of two --

6    out of the eight airlines identified, that the contracts appear

7    to cover the entire -- or the near entirety of the fleet, and

8    I'm talking about AirTran and Virgin, from what I could see.

9        There's an allegation that Frontier also has its entire

10   fleet that is covered by these agreements.

11       My understanding is that for United, there was a sort of a

12   trial run contract that was then later altered in June of 2010,

13   which maybe I don't have this correct, but it now is no longer

14   obligated to Gogo; is that correct?

15           **MR. DONATO:**  That's our interpretation, Your Honor.

16           **THE COURT:**  So that one is a little different because

17   at one time it arguably had some of its fleet sort of under the

18   contract, but it appears that that was about a year-and-a-half

19   period.  That doesn't apply today.

20       And then for Alaska, American, Delta, and US Airways, I

21   don't know if -- I guess the merger hasn't taken place yet or

22   is it still ...

23           **MR. DONATO:**  It's underway.

24           **THE COURT:**  But US Airways is still US Airways;

25   correct?

1       **MR. DONATO:** I'm not sure.

2       **THE COURT:** Okay. In any event, there where we have

3  information about sort of the numerator, how many planes are

4  covered by various contracts, and Exhibit A shows, for

5  instance, an initial fleet of Alaska of all the 737s, 114

6  planes. American shows various other portions of its fleets,

7  same with Delta and US Air.

8       What I didn't see is sort of the denominator, not knowing

9  exactly what share of Alaska, American, Delta, and US Air are

10 sort of covered exclusively by the contract.

11      And so as I sit here today, at least the one factor that

12 one would look at is sort of the percentage of the industry,

13 the line of commerce that is sort of covered by what the

14 plaintiffs characterize as an exclusive dealing contract.

15      And I understand qualitatively there's issues about how

16 easy it is to terminate, et cetera, et cetera. But just the

17 prima facie question of, what share is it? Is it half the

18 market? 20 percent of the market? If you look at all the

19 planes that are potentially available, I don't know if I have

20 the math or the math is sufficiently laid out in the complaint

21 for the Court to make that assessment.

22      So I'd like your comments on that.

23      **MR. KATRIEL:** Even though it's their motion, I'm

24 happy to --

25      **THE COURT:** Well, I'd like to give him -- it's your

1   complaint and it seems to not have all the information one

2   would hope to in order to at least come up with the preliminary

3   sense of what is the market share covered by the contracts.

4            **MR. KATRIEL:**  Thank you, Your Honor.

5      Roy Katriel on behalf of the plaintiffs.  So I'll take a

6   step back in a minute, but just so I don't avoid your question,

7   let me start directly with that.

8      I think Your Honor mentioned in the comments you just

9   made, that there were two carriers that you thought the

10   contracts provided for 100 percent coverage of their domestic

11   fleet.  In fact, Gogo's reply admits that it's three.

12      Look at page 2 of their reply brief where -- if you look

13   at lines 18 and 19 of page 2 of their reply brief, they

14   concede -- in effect they say, quote, "Similarly, apart from

15   the agreements with AirTran, Virgin America, and Delta" -- I

16   think Your Honor left out Delta.  None of the agreements apply

17   to all the carrier's aircraft but just a specifically

18   enumerated aircraft list in the addendum.

19      So we have three --

20            **THE COURT:**  Yeah, but in the reply, it's a little

21   more ambiguous about Delta.  Pages 2 to 3 identify the Delta

22   agreement as one that just covers specifically enumerated

23   aircraft listed in the addendum, and the addendum -- if you

24   look at Delta, that one is less clear to me.  I see some

25   numbers here -- for instance, there are more than 300 airplanes

1    identified in Exhibit C-1, but I don't know.

2        **MR. KATRIEL:**  Well, we don't -- I think on this

3    particular instance, their word is good enough, but we don't

4    have to take them at their word.  We can go to paragraph 38 of

5    the complaint -- the second amended complaint, and we can take

6    Delta's word for it.

7        Paragraph 38 alleges, quote, (as read) "That the Delta

8    agreement covered all aircraft in Delta's domestic fleet, and

9    that is independently confirmed by Delta's press release issued

10    on August 5th, 2008, in which it publicly touted that it was

11    equipping its entire domestic fleet with Gogo service."  And

12    then it cites to the press release and quotes from it.

13        It says, quote, (as read) "The U.S. company Delta Airlines

14    announced today that it will sell broadband wireless Internet

15    access on its entire domestic mainland fleet.  The service is

16    expected to be up and running on all domestic flights by the

17    middle of 2009," and it goes on.

18        So we now have three carriers as to which there's

19    100 percent coverage during the class period at issue.

20        **THE COURT:**  Okay.

21        **MR. KATRIEL:**  So we have three that are simply not in

22    dispute.

23        Now, with respect to not providing the denominator, I'll

24    take a step back as to that argument in a minute, but let me go

25    to the next one.  US Air, we actually provided the denominator

1   in the complaint.

2       Paragraph 42 and 43 make the allegations as to US Air.  We

3   provide the agreement, and we break it down by aircraft type,

4   and we say how many are excluded.

5       So if you look at the middle of paragraph 42, for example,

6   at lines 18 and 19, we say, "With the exception of three airbus

7   8320 aircraft, this accounts for all of US Airways' airbus

8   fleet."  Then we drop down and we explain further in Footnote 4

9   that the other airbus-type aircraft listed as part of US

10  Airways fleet, namely, the Airbus A330 and the A350, are wide

11  body planes used by US Air exclusively for international

12  routes.  So they're out of the picture.

13      And then we go further, and we say that --

14          **THE COURT:**  Where are you at now?

15      **MR. KATRIEL:**  The next page, I'm sorry.  Paragraph

16  43.  At the end of paragraph 43, we break it done by further

17  types of aircraft within US Air's domestic fleet.  The last

18  sentence of paragraph 43 says, quote, (as read) "Thus, say for

19  a handful of Boeing 757-200 aircraft," in parentheses, "some of

20  which do not even fly within the continental United States,"

21  closed parentheses, "the Gogo agreement locks up for Gogo's

22  exclusive use of a period of ten years all aircraft within

23  US Airways' domestic fleet."

24      And then we even gave a further explanation -- keep in

25  mind this is a complaint.  Further information on Footnote 5

1  that says that the only other non-airbus domestic aircraft

2  operated by US Air are 18 Boeing 737-400 planes.  But as

3  US Airways own fact sheet makes clear, these are being phased

4  out and replaced by Airbus 8321s.  So they are not subject to

5  being equipped with Internet connectivity, and their numbers

6  are already accounted for by the Airbus A321 tally, which

7  includes all Airbus A321 aircraft as part of the contract.

8      So we now have Delta added to the mix; we have US Air

9  added to the mix, which of course has merged with American

10 Airlines.  So going forward, that will be included in some

11 fashion or another.

12      **THE COURT:**  Well, yeah, but it's merged.  What's the

13 American Airlines situation?

14      **MR. KATRIEL:**  That's right.  And so -- look, things

15 could change five years from now, two years from now, one year

16 from now.  But we have a four-year class period in our

17 complaint that seeks damages for purchases already made.

18      The fact that there could continue to be mergers,

19 bankruptcies, acquisitions of some kind or another, does not, I

20 think, impact the fact that we have stated a claim for the

21 four-year period of interest during which these consumers

22 actually made their purchases and were allegedly overcharged.

23      **THE COURT:**  So what I have seen, at least as we sit

24 here, for certain periods of time, is that AirTran, Virgin

25 America, and according to the complaint, Delta and US Air, have

1    been virtually -- you would say virtually completely -- they're

2    virtually the entire fleet?

3            **MR. KATRIEL:**  Right.  And I wasn't done, but I could

4    keep going.  Paragraph 25 is Alaska Airlines, the other

5    carrier.  We quote from the actual contract.  It says that

6    Section 2.2 of the contract -- I'm sorry.  This is page 9,

7    which is the continuation of paragraph 25.  (As read) "The

8    fleet of airline aircraft on which airline will" -- and this is

9    Alaska -- "in which airline will initially launch Aircell

10   service will be Airline's entire mainland fleet," in

11   parentheses, "except for airline identified 737 Combi aircraft,

12   737 freighter aircraft and certain lease return aircraft and

13   certain retirement airline aircraft as of the effective date."

14       The Combi is a combination freighter/passenger.  So other

15   than some primarily freight 737 planes, the contract itself

16   provides that all of Alaska's domestic mainland fleet will be

17   equipped with Gogo service.

18       In fact, it goes even further because if you read the next

19   sentence in the boldface part of the contract that we quoted

20   with respect to the Alaska contract it says, (as read) "In

21   addition, Aircell will have the right and duty to install the

22   ABS equipment on airline aircraft of the same type as the

23   initial fleet as are required by the airline during the term."

24       So even going forward, this applies.  And as we said, that

25   term is ten years.  That's on paragraph 26.  So we can add

1    Alaska to the mix.

2        With respect to United, which is what they make much ado

3    about, I believe, and that's because United opted to go with

4    Gogo on a trial basis.  And so it began -- it incurred that

5    trial basis service only on its -- what's called PS or premium

6    service, which is the transcontinental domestic fleet.  We

7    acknowledge outright that it tested it for -- on those 13

8    Boeing -- this is paragraph 45 of the second amended complaint.

9    The PS -- in the middle of it.  The PS fleet consisted of 13

10   Boeing 737 PS.  That's premium service aircraft operated by

11   United.

12       But then we go on -- so you would say, "Well, that's only

13   13 planes out of United's fleet.  United probably has a large

14   fleet, so that can't be market foreclosure."  But as we say in

15   paragraph 46, even though Gogo was not provisioned on the

16   remainder of the United fleet because it was being done on a

17   trial basis, there was a separate section in the contract -- a

18   separate term, namely, Section 1.8 that restricted Gogo's

19   rivals from providing service to any of United's domestic fleet

20   other than on testing equipment on overwater flights.

21       They have since come back on the reply and said, "Well, we

22   waive that provision."  But not only is that outside the

23   pleadings, but if you look at the letter exchange that they

24   actually provide in their reply brief, it only waives it as to

25   allowing United to test other equipment, not to sell it or

1   market it.

2      So even though Gogo was not provisioned by the terms of

3   the contract on all of United's fleet during the class period,

4   Gogo was able to foreclose others from selling their service on

5   the remainder of United's planes because --

6           **THE COURT:**  During the trial period?

7           **MR. KATRIEL:**  Well, the trial period was three years,

8   yes.  So we're talking about a four-year class period.  So for

9   75 percent of the class period, yes.

10          **THE COURT:**  Although, the facts may show that it was

11  discontinued before the full three years?

12          **MR. KATRIEL:**  That's right.  I mean, the facts will

13  show what the facts will show.

14          **THE COURT:**  So you're saying at least for that period

15  of time, United was essentially locked up or locked out of the

16  market?

17          **MR. KATRIEL:**  I'm saying that the contract says that.

18  And I'm not trying to play coy when I say that because I think

19  that what the contract says is important, because they can --

20  players can, of course -- parties to a contract can, of course,

21  always choose to amend their contract in the future

22  unilaterally through their own bilateral agreement.  But if I'm

23  sitting there as a would-be competitor as ViaSat, as Row 44, as

24  Fails or some of these other entities, and I'm thinking to

25  myself, "Do I have a meaningful opportunity to enter this

1   market and recoup my costs?"  All I have before me presumably

2   is a contract that says, "I can't go and service any of United

3   planes.  I can't bank on the fact that, gosh, maybe United will

4   get acquired and maybe they'll have an out."

5        Keep in mind, when AirTran got acquired by Southwest, even

6   after it ceased to exist as that separate corporate entity,

7   even though it was now part of Southwest, Gogo took the

8   position that that still was not enough.  They sued them to

9   prevent them from equipping those bought aircraft with Row 44

10  service, and that process has not yet continued.  They admit in

11  their reply brief that only now that process is still going on,

12  that is, of provisioning some of the AirTran planes with Row 44

13  service.

14        So having walked you through some of these -- and I submit

15  that if you go through the complaint you'll see --

16             **THE COURT:**  What about American?  That one is --

17        **MR. KATRIEL:**  Okay.  American.  So American -- we

18  actually tried to lay this out in as detailed a fashion as we

19  could without being overly cumbersome, and that is because of

20  the way the terms are defined in the contract.  But if you look

21  at -- okay.  So the portion of American starts on paragraph 32

22  of the second amended complaint at the bottom of page 10.

23        And what we say forthrightly about American is that it

24  began only with sort of testing the waters, so to speak,

25  767-200 domestic aircraft.  But then it very quickly amended

1    the contract, and we cite -- we quote the contract, the bottom

2    of page 10 where the contract provides -- and the boldface type

3    is that Aircell, which was Gogo, shall have the exclusive right

4    to provide passenger connectivity services on the transcon

5    fleet and, quote, "any additional fleet."

6         Now, "additional fleet" is a defined term of art within

7    the contract, and we go through what that means.  We say at

8    paragraph 33 that "additional fleet" is defined within the

9    American Airlines agreement so as to include virtually all of

10   American Airlines domestic fleet.  I'm quoting at paragraph 33.

11   And to provide that breakdown, we dropped a footnote to

12   Footnote 1 because it turns out that the way "additional fleet"

13   is defined, there's two or three sort of other defined terms of

14   art that go into that, so it would be very cumbersome to do so.

15        But we give you the breakdown of what that is, and we say

16   that it's virtually every aircraft.  And the fact -- that fact

17   is reinforced by paragraph 34 in which we cite an American

18   Airlines press release where American acknowledges the, quote,

19   "Domestic wifi powered by Gogo is available on all 767-200 and

20   737 aircraft and most MD-80 and 757 aircraft."

21            THE COURT:  What does that leave?

22            MR. KATRIEL:  I don't know that that leaves anything,

23   quite frankly, that with -- insofar as carriers with whom Gogo

24   has contracted.  Certainly they don't have Southwest.

25            THE COURT:  No.  No.  No.  I meant -- well, the

1   American Airline is available on 767-200s, 737s, but what about

2   all the other --

3          **MR. KATRIEL:**  Right.  And so the domestic fleet, in

4   as far as we're aware, is comprised of 767, 737, 757, and

5   MD-80.  The MD-80 aircraft by American are being phased out.  I

6   think discovery will show that.

7       There really isn't much to account for beyond that that

8   I'm aware of.  So it's 100 percent of 767 and 737, by

9   American's own admission in its press release, and the

10  overwhelming majority of the narrow body 757 and MD-80 planes.

11         **THE COURT:**  They don't have airbuses?

12         **MR. KATRIEL:**  They do, but I don't believe they

13  operate them in the domestic fleet.

14      So I think we've gone carrier by carrier, and certainly --

15         **THE COURT:**  Yeah.

16         **MR. KATRIEL:**  But here's, I think, the overarching

17  point that I'd like to take a step back from:  This is some

18  excruciating level of detail, if I can put it that way, that

19  we're providing in a pleading.  We could have rested and just

20  said, "They have 85 percent market share.  Notice pleading."

21  They could have said, "No, we don't."  And that's a fact in

22  dispute.

23      They can take issue with our math, they can say, "Look,

24  there's another airplane you don't account for here and another

25  one there."  Let's do it.  Let's have that discovery and figure

1    out who's telling the truth.

2              THE COURT:  Do you estimate bottom line here in your

3    complaint that when you add all this up --

4              MR. KATRIEL:  Yeah, we said 85 percent --

5              THE COURT:  Where is that?

6              MR. KATRIEL:  -- repeatedly.

7         Paragraph 22 is the first place we cite, but it's

8    certainly not the only place.  We cite in paragraph 22, quote,

9    (as read) "But Gogo's market share goes beyond the 85 percent

10   of domestic aircraft that are actually equipped to provide

11   inflight service that is referenced in Gogo's IPO papers."

12        We go on.  We say, (as read) "In fact, Gogo possesses at

13   least an 85 percent market share of all commercial aircraft

14   servicing flights within the continental United States because

15   Gogo has entered into long-term exclusive agreements with most

16   domestic carriers, pursuant to which Gogo is the exclusive

17   provider permitted to provide Internet service for these

18   carriers' entire or near entire fleet."  And the paragraph goes

19   on, but there's the language of importance.

20             THE COURT:  All right.

21             MR. KATRIEL:  It seems to me you have to take that

22   factual recitation as true.  They can argue against it and

23   disbelieve it.  They can tell you that our math is wrong.  Let

24   them show it.  But I don't know of any case that says that in a

25   complaint I have to show you my math to get to how I calculated

1   market share.  I could have just said 85 percent.

2      Remember, most of the times I would not have had the

3   contract before I filed my complaint.  And so I would have just

4   said -- so what's their fallback position?  Because I think

5   we're going to be hearing that soon.

6      And that is "Well, you know, if you believe our IPO

7   papers, we said we only had 16 percent market share."  That's

8   true if you do, but it is fanciful to suggest that the doctrine

9   of incorporation by reference says that you have to accept as

10   true and unchallengeable every assertion made by a defendant in

11   its papers.  There'd be no securities cases that way because

12   every securities case references the SEC papers made by the

13   defendant.  The defendant could simply say, "And we never broke

14   the law in the SEC papers."  And they would say, "You can't

15   challenge that if you incorporated it by reference."

16      Doctrine of incorporation by reference as this Court and

17   the Ninth Circuit have said, mean that you cannot avoid the

18   existence of a document that you have referenced and,

19   therefore, incorporated by reference into the pleading.  But

20   the truth of the assertions made in that document are obviously

21   subject to challenge.

22      So we obviously don't run away from the fact that they

23   have said something contrary in their SEC papers.  We would be

24   shocked if they were to admit in their SEC that they're an

25   antitrust violator.  But that I submit gets them nowhere.

1    **THE COURT:**  All right.  Let me hear the response.

2    Why isn't this, at least for purposes of establishing

3    substantial market share, substantial share of the market

4    sufficient for 12(b)(6) purposes?

5    **MR. DONATO:**  Happy to answer that, Your Honor, in

6    terms of -- for Gogo.  I was reminded while I was listening to

7    my opponent that my son is a junior in high school, and he's

8    just starting his SAT practice prep, and we came across the

9    answer last night, D, not enough information provided.  And

10   that's what we have here.

11   Now, my opponent thinks he showered us with a wealth of

12   details.  That may be, but they're not the details that make a

13   lick of difference in this case.  This case is a case alleging

14   substantial foreclosure of the alleged relevant market.  They

15   can recite contract details and airline headcounts to death.

16   But it doesn't answer the fundamental question in this case,

17   what portion of this alleged relevant market has been

18   foreclosed to competition?  Not to competitors but to

19   competition.

20   And we know that's the vital question, because if it's not

21   above a 30 to 40 percent range in the case law, they don't have

22   a claim.  They can cite to the most egregiously

23   anti-competitive contract terms in the world.  Let me footnote

24   that; those are not our contracts.  I'm just saying

25   hypothetically.  They can cite to this most egregiously

1   anti-competitive terms, and it doesn't make a lick of

2   difference unless it forecloses based on allegations of

3   evidentiary fact and not lawyerly fiat.  Unless it forecloses

4   30 to 40 percent of the market.  That is the vital piece that

5   is missing here.

6       They do not provide this Court with any information

7   whatsoever to say whether 2, 5 or 80 percent of this market is

8   foreclosed to competition.  There is nothing in here that gives

9   them the denominator.  They can headcount planes here and there

10  for various airlines, but what matters is their allegation in

11  paragraph 22.  They're talking about all commercial aircraft in

12  the United States.  They've got to show you to make this case

13  go forward that we have foreclosed opportunity in 30 to

14  40 percent.

15          THE COURT:  Well, they've alleged 85 percent of the

16  market share of all commercial aircraft within the U.S. are

17  subject to long-term exclusive agreements.

18          MR. DONATO:  But that's a conclusory allegation,

19  Your Honor.  There's no factual basis showing that 85 percent

20  is a cognizable number.  That's just lawyers saying 85 percent.

21      I agree.  Look --

22          THE COURT:  There's more to it than just that.

23  There's pages and pages and pages going through each of the

24  airlines in which they specifically allege not only numbers but

25  saying for some -- it is US Air's -- all aircraft within US

1    Air's domestic fleet for -- you know, going through each.  The

2    Delta covers all aircraft in Delta's domestic fleet.  So it's

3    certainly more than a one-sentence conclusory statement.

4           **MR. DONATO:**  But it's missing the punchline.  A

5    percentage is a ratio.  They've given you part of the ratio,

6    the upper half number saying here are the number of planes

7    under these contracts.

8           **THE COURT:**  Well, they say almost all.

9           **MR. DONATO:**  Yeah, but we know that's not the case,

10   and I'll get to that in just one moment.  They're talking about

11   all commercial airlines in paragraph 22.  Aircrafts, not

12   airlines.  All commercial aircraft in paragraph 22.

13        They've given you some headcounts for what certain

14   airlines have in their fleets that are supposedly under our

15   binding contracts.  They don't give you the basis to show what

16   percentages of the bucket those airlines -- those aircraft are

17   for the overall fleet.

18        It may be possible -- we just don't know because they

19   don't answer it.  That if you take all those numbers that he

20   just walked through, 93 for US Air, you know, 114 for Alaska,

21   whatever it may be, you add that up and that turns out to be

22   15 percent of the commercial aircraft.  And there's strong

23   probability and possibility that that may be the case,

24   Your Honor, because, as the plaintiffs concede, we don't do a

25   lick of business with Southwest.

1    Now, by any measure Southwest is one of the largest, if

2    not the largest, airline in the United States.  We do business

3    currently with 13 planes out of United's fleet.  United is by

4    any measure one of the largest airline providers in the

5    United States.

6    So they're asking on a wing and a prayer to take

7    85 percent as a real number, but it's not.  It's a conclusion

8    from the lawyers.  There's no data that supports that.  Now,

9    look, I understand, I'm not asking --

10    **THE COURT:**  Well, I wouldn't say there's no data that

11    supports it.  You're saying there's no data that conclusively

12    proves that because it has both aspects of the denominator and

13    the numerator and that their qualitative description is

14    "covered all aircraft in Delta's domestic fleet" is not enough

15    because you've got to show the exact number on the denominator

16    as well as the numerator in order to substantiate that

17    particular statement.

18    **MR. DONATO:**  Well, you certainly have to have some

19    substantiation.  Saying all of Delta is covered does not answer

20    the question, what portion of the commercial aircraft number in

21    the country are foreclosed to competitors?  It simply does not.

22    It is a data point, absolutely.  You're correct.  I totally

23    agree with you.  It does not answer the question, though,

24    whether Delta is enough or whether Delta, plus US Air, plus

25    Alaska, or whatever combination they want is enough to show

1  substantial foreclosure such that this antitrust case should go

2  forward.

3      I understand they don't need to bring in a calculator.

4  And we're not saying that they do, but they have to have enough

5  non-conclusory evidentiary allegations to make that 85 percent

6  an acceptable number.  I think you heard my opponent say it.  I

7  certainly did.  He's harkening back to the pre-*Twombly*,

8  pre-*Iqbal* standard of, "Well, if I say it in the complaint, you

9  have to live with it.  We'll let the facts deal with it later."

10  That is not the case these days.  Particularly in an antitrust

11  case as *Twombly* instructs.

12      Before you throw open our cabinets and the massive

13  discovery and expense, they got to show you they've got a

14  cognizable claim.  And for the third time here, we think they

15  don't.

16      Now, there are a lot of details on these contracts I'd be

17  happy to discuss.  I don't think we need to.  I mean, I'd be

18  happy to explain to you why AirTran is a completely illusory

19  situation, given the fact that they de-installed our equipment.

20  We can talk about how United went to an opponent of ours, a

21  rival of ours.  But let me -- I'm happy to do that.  If you

22  don't want me to, I won't.

23      But let me just conclude with one practical observation.

24  This is an antitrust case about an actual real world market.

25  This market was basically created, as plaintiffs allege, by my

1   client in 2008.  What's happened since 2008?

2       Since 2008, we have seen multiple rivals come into this

3   business.  And not just come into this business, but to launch

4   an entirely new version of the technology based on satellites.

5   Arguably, a next generation type of technology versus our

6   air-to-ground current technology.

7       So these competitors not only were not deterred from

8   coming in, they came in in a huge way with a satellite-based

9   communication system.  Nobody has been deterred from entering

10  this marketplace, which is one of the key indicia of a market

11  that has been substantially foreclosed to competition.  Exactly

12  the opposite has happened.  Competition has flowered.

13      And once in the market what has happened to Gogo's

14  customer relations?  We don't have one of the very largest

15  airlines, Southwest, doing business with us at all.  And we

16  have 13 planes on United doing business with us.  That

17  business, United and Southwest, those two behemoth airlines are

18  going to rivals.  Rivals that didn't exist when we opened our

19  business in 2008.  There is no way you can look at that from a

20  practical point of view and say, "This is a locked up tight,

21  foreclosed market where competition, not a competitor" --

22          THE COURT:  Well, it's a changing market.  And part

23  of -- I think the response that we've already heard is that,

24  for instance, United, which is a big share of the market, that

25  may be enough to tip it in one direction or another.  But at

1   least for a period under which they were contracted, their

2   Sherman Act argument is a stronger claim than perhaps it might

3   be now.

4           **MR. DONATO:**  Well, I would push back on that,

5   Your Honor.  Let's assume first of all it's wrong, and I'll

6   demonstrate why in a moment.  But let's assume that United was

7   actually on ice for two years.  Let's assume that.  That's what

8   they say.  Totally frozen from 2008 to 2010.  What difference

9   has that made?

10      United today is not our customer for all but 13 planes.

11  How has competition been harmed by the fact that taking

12  everything they say is true, that for two years United had to

13  look at us and only us.  What happened?  Exactly what you would

14  expect in the competitive market.  They looked at us and said,

15  "Nah, we're going to move on," and they did.  They took that

16  entire United fleet, one of the very largest in this country,

17  and moved to a rival.  Where is the competitive harm?  Even

18  assuming that it blocked people.

19      Now --

20          **THE COURT:**  Well, you can have competitive harm for

21  that period, that two-year period.

22          **MR. DONATO:**  Well, what's the harm?  Our technology

23  was installed on 13 United planes.  United didn't pay a penalty

24  to de-install our equipment from thousands of planes.

25          **THE COURT:**  I assume they're going to say that there

1  are other entrants and the markets were delayed or deferred or

2  deterred or barred from effectively entering that market during

3  that time just because, as things later turned out -- things

4  got more competitive doesn't mean that there was a period of

5  time that there was no -- there was no anticompetitive --

6          **MR. DONATO:**  But I have two answers to that.  One,

7  that's not alleged in the complaint.  And, two, this industry

8  has existed for five years.  This thing did not exist before

9  2008.  This is a five-year industry.

10     So the idea that there was an incumbency period like you

11  might have in an industry that's been around for 30 or 40 or

12  50 years doesn't apply here.  This is a baby, tiny, infant

13  industry.  So if you have -- and we invented it.  Of course,

14  over time -- there was a moment in time where we had everything

15  because nobody existed.  We were the only technological movers

16  in this space, but that's not an antitrust violation.

17          **THE COURT:**  That may be the issue as we get later

18  down the line.  That's not something that can be resolved on a

19  12(b)(6).

20          **MR. DONATO:**  Well, no.  But the Ninth Circuit has

21  said, and as other courts in this district have held, high

22  market share alone is not foreclosure.

23          **THE COURT:**  No.  But it is one of the predicates in

24  an exclusive dealing contract.  You look to the portion of the

25  market that's been foreclosed.

1          **MR. DONATO:**  Portion of the market has been

2     foreclosed, but that is not market share.  Having an 85 percent

3     or 100 percent market share absolutely, as a matter of law,

4     does not mean you have foreclosed 85 or 100 percent of the

5     market.

6          **THE COURT:**  I thought the allegation here is

7     85 percent of the available aircraft were essentially covered

8     by one of these -- one or more of these exclusive dealing

9     contracts.  Whether you call it market share or not, that was,

10    at least according to their theory, essentially taken off the

11    table because of the exclusive dealing contract.

12         **MR. DONATO:**  Well, let's take that as they're given.

13    They still have not passed the *Iqbal* and *Twombly* test to make

14    that a meaningful non-evidentiary, non-conclusory allegation.

15    Reciting the headcount under contracts does not tell you

16    85 percent of the market.  It cannot tell you that because

17    you're missing the key denominator data against which that must

18    be compared.  You cannot come into court and just say,

19    "100 percent of this market is foreclosed.  Here are a number

20    of contracts showing people who do business with that company."

21    That does not tell you the foreclosure rate.  It cannot tell

22    you the foreclosure rate.

23         And to allow that to go forward is to, I think, breeze by

24    not only the foreclosure analysis but also *Iqbal* and *Twombly*.

25    They have to have more than the lawyers just saying, "We're

1    going to sell you -- tell it to you now, and then we'll see

2    what discovery says."  You can't do that as the Court is amply

3    aware.

4        I want to just, for the sake of completeness, make one

5    comment about United.  And I'm referring to their second

6    amended complaint at Tab 8, which they incorporated the United

7    contract.

8        The idea that United was foreclosed for years is just not

9    right, based on that contract.  You'll see in Section 1.2,

10   United agreed for a 180-day period to take a look at Gogo.

11   They had three options at the end of that 180-day period.

12   Under Section 1.2 C, they had the option of de-installing the

13   Gogo equipment from the 13 aircraft.  And an option that was

14   called the termination option.

15       Now, whether United or not decided to do it, whether they

16   went on for a couple years isn't the issue.  On the face of

17   this very contract that plaintiffs have staked so much, the

18   contract itself shows United had the right to terminate in

19   180 days.  You cannot, as a matter of law, find foreclosure

20   under a contract that can be terminated on 180 days.  Whether

21   they did it is irrelevant.  It's the right they had under the

22   contract.

23           **THE COURT:**  All right.  Let me hear response to that

24   because United, obviously, is a large component of the market.

25   And if in fact the lockdown period was only 180 days, I'm not

```
 1   sure it's valid to include them in the analysis even during

 2   that short period.

 3        MR. KATRIEL:  Your Honor, if you get on a plane right

 4   now on United and fly to New York and you want Internet

 5   service, you'll get it from Gogo.  It's more than 180 days

 6   since they signed the contract.

 7        THE COURT:  Well, that's a matter of choice.  You're

 8   talking about locking people in, as a legal matter, to preclude

 9   them from the market.  Because if every airline had a clause

10   that said you can just leave whenever you wanted to and they

11   all stayed, that's not an antitrust violation.

12        MR. KATRIEL:  And what we -- and two points with

13   respect to that.  If you look at Section 1.8 of the -- if you

14   look at Section 1.8 of the contract with United, it says that

15   other than testing equipment, United was -- for the entire

16   period, not just the lock-in period -- forbidden from servicing

17   or selling or providing any other rival services on any of its

18   planes.  It can test them, primarily for overwater flights, but

19   it could not market them; it could not sell them.  It could not

20   do business in effect with anybody else.

21        My second aspect of the United contract is that even if

22   you take United out of the equation -- remember, we're starting

23   with an 85 percent market share allegation.  Let's say --

24        THE COURT:  How do you get that 85 percent?  There's

25   no -- you've got a lot of numbers, but how do I know which --
```

 1   is Southwest the other 15 percent, or -- you would think

 2   Southwest had a lot of planes.  How do you get 85 percent?

 3           **MR. KATRIEL:**  Well, when they admit that they have

 4   contracts with nine out of the ten domestic carriers, that's

 5   not in dispute.  That's in their SAC.  So that leaves

 6   Southwest.

 7       And when they admit that out of -- they admit that out of

 8   those nine, three of them were 100 percent covered by their

 9   contracts.  And what we have shown to you is that there's about

10   three others that were very close to 100 percent, whether it's

11   92, 93 because in the case of US Air, we cite there's only a

12   handful of 737 aircraft and three airbus 320s that are out.

13   Even if you account for Southwest, that brings it down to

14   85 percent.

15           **THE COURT:**  How do you get 85 percent, is what I'm

16   asking?  Is that a guess?  Do you actually have a numerator and

17   a denominator?

18           **MR. KATRIEL:**  We do have a numerator, and we do have

19   a denominator.  And --

20           **THE COURT:**  Isn't that an easy thing to do, then?

21   Just say when all is said and done, when you add up how many

22   planes AirTran has available, and how many Delta has and how

23   many have been locked up, you add it all together and you

24   exclude Southwest but you add them to the denominator, we get X

25   over Y.

1      **MR. KATRIEL:**  That's right.  We could do that.  But

2  the point then is -- is that what we would then see in their

3  motion and what we would be seeing in this hearing is a battle

4  over math, and they would say, "It's not 80 percent because you

5  failed to account for this aircraft and this aircraft, and the

6  list you provided is not correct," and we would say it is.

7      **THE COURT:**  At some point I say, "Okay.  Fine.  We'll

8  deal with that on summary judgment."

9      **MR. KATRIEL:**  I think we've gone far and beyond, and

10  let me -- Mr. Donato keeps referring --

11      **THE COURT:**  But if you say you already have

12  calculated the 85 percent, why not at least set forth the basic

13  math on that?

14      **MR. KATRIEL:**  Because for most of these carriers,

15  there is no math to be had that says "all of them."  Right?  We

16  have --

17      **THE COURT:**  No.  But it's important because you're

18  adding it all up for total market.  You say "all of them."

19  Well, how many is Virgin?  How many aircraft do they have

20  compared to United?  I don't know.

21      **MR. KATRIEL:**  But at the end of the day, Your Honor,

22  if we add up all the aircraft, if we go carrier by carrier by

23  carrier, the only carriers with whom they don't have an

24  outright exclusive provisioning agreement was United.  But we

25  told you that in United they had Section 1.8 that says even

```
 1    though they're not entitled to put their equipment in all the

 2    planes, they had this provision that --

 3              THE COURT:  During that period.

 4              MR. KATRIEL:  Yeah, but that's our period of

 5    interest.  I understand we can keep shifting grounds and say,

 6    "Tomorrow that may not be true."  Maybe not, but that doesn't

 7    bar our claim for damages.

 8         But let me -- I would be remiss if I simply let the

 9    Twombly remark and the no need for a calculator but a need for

10    the denominator argument just go by, because Twombly didn't say

11    that a plaintiff has to back up each of its factual allegations

12    with evidence.  What Twombly said was allegations of fact must

13    be taken as true.  It is only legal conclusions that, even if

14    couched as fact, need to be supported by plausible evidence or

15    plausible factual allegations.

16         Saying that they have contracts that cover eight and a

17    half out of every ten domestic airplanes is a statement of

18    fact.  They can disagree with that.  They can show us that

19    we're wrong.  They can move tomorrow on Rule 12(c) for a motion

20    of judgment on the pleadings if you deny their motion and say,

21    "Look, here's the tally of aircraft.  Here's the tally of the

22    ones we have under contract.  It's much less than 85 percent."

23    Of course, just saying it's less than 85 percent doesn't get

24    them off scot-free.  They have to show it's less than

25    40 percent, and that's a far cry.
```

1    But tieing it back to *Twombly*, this Court issued an

2    opinion on this very subject, not before *Twombly* but last year,

3    and it said, quote -- it was the Oracle case where you cite --

4    where this Court cited the Ninth Circuit *Newcal* decision.

5    And -- I'll find it in a minute because it addresses the exact

6    issue that we're dealing with.  Let me get my table of contents

7    here so I don't spend up too much time.  It's on page 3 and we

8    cited it.

9    There is -- I'm quoting from Oracle *America v.*

10   *Cedarcrestone America*, decided last year by this Court, which

11   in turn was quoting the Ninth Circuit decision in *Newcal*

12   *Industries v. Ikon Office Solution*.  This was decided last

13   year.

14   (As read) "There is no requirement that the," quote,

15   "market power," unquote, "or relevant market," unquote,

16   "elements of an antitrust claim be pled with specificity."

17   We could have just said 85 percent market share.  And,

18   quite frankly, most of the time, that's what we could have come

19   in here saying because we would not have had the contracts.

20   Those contracts are confidential.  We happened to get them

21   after prevailing on their objection to our discovery.

22   And that's not a lone case, because the Ninth Circuit has

23   also said in the *Hunt-Wesson Foods* case that we cited, page 15,

24   of our brief, quote, (as read) "Where such an inference is not

25   implausible on its face, an allegation of a specific market

1    share is sufficient as a matter of pleading to withstand a

2    motion for dismissal."

3         Now, *Twombly* didn't change that, because an allegation of

4    market share is a factual allegation.  We say, "You have a

5    contract that applies to eight and a half out of every ten

6    domestic aircraft."  They say, "No, we don't."  That's a

7    factual dispute.  That is not captured by *Twombly*.  You still

8    have to accept it as true.  It is not a legal conclusion

9    couched as fact.  It is a factual assertion.  Maybe we're

10   wrong.  Maybe if you believe them, we're making it up.  They

11   can show that.

12        Thank you, Your Honor.

13            **THE COURT:**  Thank you.

14   I'll give you the last word.

15        **MR. DONATO:**  First, on the United point, Section 1.8

16   that my opponent referred to refers to United taking a look at

17   Gogo for a period through the election date.  That's defined as

18   180 days in Section 1.2 of their contract.

19        So no matter how you slice it, United had a 180-day hold

20   period to look at Gogo.  And after that, it was totally up to

21   United to do whatever it wanted.

22            **THE COURT:**  So you're saying even at 1.8 United was

23   not barred after 140 days from looking and contracting with

24   other services for purposes other than just testing?

25            **MR. DONATO:**  That's precisely right.  It says, "Prior

 1   to the election date."  The election date is defined in

 2   Section 1.2 as a 180-day period.

 3        Now, on top of that, I admire my counsel's -- my

 4   opponent's tenacity on this *Iqbal* point, but he's just wrong.

 5   He's doing exactly what *Iqbal* and *Twombly* said you can't do,

 6   which is say, "We'll tell you it's 85 percent, and we'll deal

 7   with it later."

 8        **THE COURT:**  Well, it does make a distinction between

 9   legal conclusions and factual allegations, and it's the degree

10   of specificity; right?

11        **MR. DONATO:**  Well, truly, but --

12        **THE COURT:**  They can just say they had great share of

13   the market.  Well, maybe that's not enough.  But when you start

14   putting numbers into it, at what point do you say, "Well, I

15   want to see what's behind those numbers?  I want to know how

16   you derive those numbers at a 12(b)(6) stage."

17        **MR. DONATO:**  Two issues with that.  And this is why

18   this is absolutely the right stage to be looking at it.  First,

19   *Iqbal* directly addressed this.  I know the Court is very

20   familiar with the case, but I think it bears meditating on for

21   a moment.  *Iqbal* specifically said that we, quote, "are not

22   bound to accept as true a legal conclusion couched as a factual

23   allegation."  That's *Iqbal*, *129 Supreme Court 1950*.  That's

24   exactly what we're being asked to do here.

25        **THE COURT:**  That's when you say the officer used

1    excessive force on me or --

2         **MR. DONATO:**  Yes.

3         **THE COURT:**  -- the employer had a discriminatory

4    intent.

5         **MR. DONATO:**  Yes.

6         **THE COURT:**  When you say 85 percent, that's a lot

7    more than saying this person violated -- foreclosed a

8    substantial share of the market.

9         **MR. DONATO:**  But I think that's exactly the same

10   thing, because to say the officer used excessive force under

11   1983 law is to say exactly what he's saying here, they

12   foreclosed 85 percent of the market.  It begs the question, and

13   you can't do that at the pleading stage when your test is

14   plausibility.  You have to say something that's plausible, and

15   my opponent touched on it.

16      You asked a question -- and I think it's absolutely the

17   right question -- and we can't answer it, which is fatal for

18   the complaint:  If the two largest airlines in this country are

19   not part of the Gogo contracts, how can you possibly plausibly

20   say 85 percent of this market is locked up?

21        **THE COURT:**  That's the question.  It's plausibility

22   not specificity, it seems to me.

23        **MR. DONATO:**  I'm happy to couch it as plausibility

24   because that is the governing standard.  But no matter how

25   you -- what descriptor you use, you get to the same conclusion,

```
 1    which is they haven't given anything close to the evidentiary
 2    allegations necessary to make this 85 percent number that they
 3    hang their hat on remotely plausible.  Particularly in light of
 4    the concessions, which are undisputed, that the two colossuses
 5    in this business are now part of our team, are not Gogo --
 6         THE COURT:  They haven't conceded the United
 7    component, at least for some period of time.  I think --
 8    whether it's currently the case, I don't know.  But --
 9         MR. DONATO:  I'll give them the 13 planes, but the
10    rest of United, plus Southwest -- we don't know, and that's the
11    fatal flaw in their complaint.  To let this go forward is to
12    let them completely omit a plausible allegation of substantial
13    market foreclosure sufficient to state a Sherman Act claim.
14         THE COURT:  All right.  Let me just ask you for the
15    last time.  Why can't you provide the math -- because I don't
16    know -- Southwest.  There are a lot of Southwest planes out
17    there.  How do I know they're not 40 percent of the market in
18    and of itself?
19         In other words, you've done the calculation -- apparently,
20    it seems you have to get 85 percent.  Why can't you
21    explicate -- why shouldn't you be required to at least
22    explicate how you get those numbers and maybe contest it.  It's
23    true we're not going to get there, but at least an explaining
24    to give it some plausibility when you have a major player out
25    there.
```

1    And I don't know how big their market is.  I could

2  probably find that on the Internet pretty quick.  But I guess I

3  don't understand what the problem is, even if it's an estimate,

4  even if it's a good estimate based on whatever you can

5  ascertain about denominator and numerator.

6          **MR. KATRIEL:**  Could we do it?  We could.  But the

7  question is should we be required to do that as a matter of

8  pleading, and the rule of law is pretty clear that we ought not

9  be required to do that.  And I think that -- the hesitation

10  here is in part not only because it's not the law and we're

11  here now on a second round, but let's say we did that, are they

12  just going to accept that?  No.  And we're going to be here

13  again six months from now where they're going to dispute our

14  math or they're going to --

15          **THE COURT:**  It doesn't end the case --

16          **MR. KATRIEL:**  No, of course it doesn't end the --

17          **THE COURT:**  -- it's an important gatekeeper to make

18  sure there's enough plausibility here to then go forward to

19  justify what is going to be a large case if this case proceeds.

20          **MR. KATRIEL:**  Well, as to the matter of

21  plausibility -- it seems to me the issue of plausibility --

22  remember, where we started from this case.  We started months

23  ago.  The only reason this has come up is because we had a

24  representation from the other side that says this doesn't even

25  apply fleetwide.  We contract one airplane at a time.  And now

1    when we say, "Show us the contracts," and the contracts show

2    the opposite, they're saying, "Well, we take that back.  But

3    you know what?  It's still implausible because you haven't

4    shown us the math."

5        And what are they going to say three months from now when

6    we do show them the math?  "Well, you didn't account for that

7    aircraft out in the desert in that other pool."  We can have

8    those discussions.  We can have those debates.  But those are

9    part and parcel of trying the case and litigating it.

10           **THE COURT:**  Now, let me ask you about this United

11    thing --

12           **MR. KATRIEL:**  Yeah.

13           **THE COURT:**  -- what about 1.8 and prior to the

14    election date?

15           **MR. KATRIEL:**  Sure.  And I'm glad that Your Honor is

16    giving me a chance to address it because -- here we go.  I have

17    the United contract in front of me.  It's part of the record.

18    It's Exhibit 8 to our second amended complaint.

19        And my colleague on the other side is quite correct that

20    under the initial term of the contract, which was for 180 days,

21    it provided three options that United had to exercise within

22    180 days, which is either give the stuff back, expand it to its

23    whole fleet, or allow Gogo to continue providing it on the

24    transcontinental fleet.

25        It, evidently, chose to do the last one of those -- the

1   last that I mentioned, which is provide it on the

2   transcontinental fleet, because as I say, if you fly to

3   New York today on United, you will get Gogo service.

4        And that brings us to Section 1.5 of the agreement.

5   Your Honor, has it.  So I know I'm hitting you with a lot of

6   sections, but basically it says that if that's what United

7   chooses, the two parties will negotiate.  Upon making that

8   election, will negotiate a separate agreement known as the PS

9   Agreement, the Premium Service Agreement, under which Aircell

10  will continue to provide connectivity services on the PS fleet

11  for a five-year term, and then it goes on and on.

12       And we know that that's what happened because we know that

13  on the premium service fleet, United contracts with Gogo to

14  provide that service and has done so even after it elected to

15  go with another provider on other portions of its fleet.

16       Section 1.8 does not say that that inability to sell rival

17  provider services on the remaining planes applies only during

18  the 100-day election period.  It says during the entire time

19  that there is an agreement.  And there is a separate Premium

20  Service Agreement.  And because the Premium Service was

21  provided by Gogo, even after United made that 180-day election.

22       The 180-day election period does nothing here to

23  ameliorate the market foreclosure, because during the 180 days,

24  no other provider can come into United because 13 planes are

25  provided by Gogo and because the remaining United planes are

 1   off the market.  And we now know that after the 180 days United

 2   made an election to continue with Gogo on those planes, and we

 3   still have Section 1.8.  So -- for five years, not for three

 4   years.  For five years.  It's -- that's Section 1.3.

 5        So now I also think that there's a theme here that Gogo

 6   has tried to press that we're just wrong on the 85 percent.  I

 7   don't think we are.  And I think we've provided enough detail

 8   as to why we're not.  But let's assume we are.  They have to go

 9   beyond showing that our math fails, but they have to show that

10   our math fails miserably because by their own assertion, we can

11   have a viable exclusive dealing anti-trust case with just

12   40 percent.

13             **THE COURT:**  I understand that.

14             **MR. KATRIEL:**  Thank you, Your Honor.

15             **THE COURT:**  Thank you.  I'll take it under

16   submission.  Appreciate it.

17             **MR. DONATO:**  Thank you, Your Honor.

18             **THE COURT:**  Thanks.

19        (Proceedings concluded at 4:00 p.m.)

20                         ---o0o---

21

22

23

24

25

1    I certify that the foregoing is a correct transcript from the

2    record of proceedings in the above-entitled matter.

3

4    _____         February 17, 2014

5    Signature of Court Reporter/Transcriber    Date
     Sarah L. Goekler

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25